Jose CISNEROS et al.

v.

CORPUS CHRISTI INDEPENDENT
SCHOOL DISTRICT et al.

Civ. A. No. 68–C–95.

United States District Court,
S. D. Texas,
Houston Division.

June 4, 1970.

James Wolf and Chris Dixie, Dixie, Wolf & Hall, Houston, Tex., James De-Anda, Edwards & DeAnda, Corpus Christi, Tex., for plaintiffs.

J. W. Gary and Richard A. Hall, Branscomb, Gary, Thomasson & Hall, Corpus Christi, Tex., for defendants.

## MEMORANDUM OPINION

SEALS, District Judge.

In Civil Action Number 68–C–95, a civil rights class action, the following will constitute the Findings of Fact and Conclusions of Law, and may be amended and/or supplemented at a later date,[1] but these Findings today will control and determine the disposition of the issues before us.

First, this court finds that it has jurisdiction and that this is a proper class action under Rule 23 of the Federal Rules of Civil Procedure.

Needless to say, this court considers this to be a most important case. Not only because of the great interest that has been manifested by the large attendance of citizens in the courtroom, and the amount of time and space the news media have devoted to the coverage of the trial, but the court also realizes and understands that we are considering two of the most important aspects and interests of the school patrons and also of the school administration: the taxes of money and the children.

Because it is an important case I want again to express my appreciation for the efforts of the attorneys who have appeared here, not only for their cooperation in providing the court with all the relevant and pertinent evidence, voluminous data and statistics, but also for well-written briefs, and also for the expeditious manner in which the evidence was presented.

1. The hearing of this case commenced on May 14, 1970 and continued daily thereafter, except from May 25 through May 29 (during which time the court attended the Fifth Circuit's Annual Judicial Conference), until the conclusion of the evidence on June 3, 1970.

This type of legal controversy, which is prevalent all over the country, has finally come to the City of Corpus Christi, as it has come to many other communities over our land, and the magnitude of the problem is reflected in the great volume of litigation and opinions which we lawyers are familiar with.

Although, as you could realize, it has not been an easy task, I have had the advantage of three (3) weeks of night and day studying these exhibits, this voluminous data, taking two brief cases to Miami, constantly reading the opinions and having them available to me as they are published, and also, thanks to the attorneys in the case, of having the advantage of having daily copy made of the proceedings and testimony. One great advantage and help to the court was the way and manner all the statistical evidence was worked and catalogued at the beginning of the trial, and which was offered and stipulated to early in the trial, and which was available to the court for study for these three (3) weeks. We also were fortunate in having available

every recent appellate decision concerning these matters.

Although the statistical data and evidence was largely undisputed, I find as a matter of fact for the record that the data presented by the plaintiffs is accurate and correct as to student populations, percentages of ethnic groups—that is, as we have called them in this trial, Anglo, Negro and Mexican-American—locations of schools, and the make-up of the student population, the location and ethnic patterns of general population within this area, the number of teachers, the schools they are assigned to, and the ethnic background of each teacher in each school, and the location of past and present boundaries, the time and cost of construction of new schools, the cost of renovating of old schools, the number of children bussed in the past and in the present, and who they were, and who they are.

I especially find that the plaintiffs' Exhibits No. 4,[2] 4–A,[3] 4–B,[4] 4–C,[5] and 4–D [6] are accurate and very illuminating. The same is true for plaintiffs' Exhibits 6–A,[7] 6–B,[8] 6–C,[9] and plaintiffs' Exhibit

2. Plaintiffs' Exhibit 4 is a base map of the principal streets and freeway system of Corpus Christi, Texas.

3. Plaintiffs' Exhibit 4–A is a base map of Corpus Christi, Texas, which shows the geographic attendance zones for all elementary schools within the Corpus Christi Independent School District and which also shows whether the student population of elementary age within each such geographic attendance zone is less than 20%, 20–40%, 40–65%, or more than 85% non-Anglo-American.

4. Plaintiffs' Exhibit 4–B is a base map of Corpus Christi, Texas which shows the geographic attendance zones for all junior high schools within the district and whether the student population of junior high school age within each such zone is less than 15%, 20–25%, 60–65% or more than 90% non-Anglo-American.

5. Plaintiffs' Exhibit 4–C is a map of Corpus Christi, Texas which shows the geographic attendance zones for all high schools within the district and whether the student population within each such zone

is less than 10%, 20–25%, 75–90% or more than 90% non-Anglo-American.

6. Plaintiffs' Exhibit 4–D is a map of Corpus Christi, Texas which shows the city divided into the 27 geographic census tracts in which the Census Bureau took the 1960 census. The map shows the total number of Negroes, Mexican-Americans and Anglo-Americans that resided within each such census tract in 1960.

7. Plaintiffs' Exhibit 6–A is a map of Corpus Christi, Texas which shows all the elementary schools within the district and the total number of Negro, Mexican-American and Anglo-American students and staff employees at each school during school years 1968–1969 and 1969–1970.

8. Plaintiffs' Exhibit 6–B is a map of Corpus Christi, Texas which shows the same information for each junior high school within the district as does plaintiffs' Exhibit 6–A for each elementary school (*supra*, note 7).

9. Plaintiffs' Exhibit 6–C is a map of Corpus Christi which shows the same infor-

7,[10] also plaintiffs' Exhibit No. 35,[11] and plaintiffs' Exhibit 36.[12] The court accepts as true and correct the other objective data and statistics offered by the plaintiffs.

Of course, most of this evidence, if not all, was furnished by the defendants, and the court is deeply appreciative of the cooperation, and of the long, tiresome work that the school administration had to undertake to furnish this data.

I also find that the defendants' objective statistical evidence is true and correct, such as defendants' Exhibits 1,[13] 2,[14] 2-A,[15] 3,[16] 3-A,[17] 4,[18] 5,[19] 6,[20] 7,[21] 9,[22] 10,[23] 11,[24] 14, 15 and 16.[25]

mation for each high school within the district as does plaintiffs' Exhibit 6-A for each elementary school. (*supra*, note 7).

10. Plaintiffs' Exhibit 7 shows graphically the number of children in each group (Negro, Anglo-American and Mexican-American) that during the 1969-1970 school year attended schools which had more than 90%, 80-90%, 70-80%, 60-70%, 50-60%, 40-50%, 30-40%, 20-30%, 10-20% or less than 10% non-Anglo-American enrollment. The information is presented separately for each of the three school levels (elementary, junior high, and senior high).

11. Plaintiffs' Exhibit 35 is a map of Corpus Christi which shows the locations of residential subdivisions in the city which have had deed restrictions limiting the right of ownership of lots to members of the white race. These subdivisions are very noticeably clustered along the south and north sides of a centrally located area of Corpus Christi, euphemistically referred to during the trial of this case as the "corridor," which contains a high density of Mexican-Americans and Negroes.

12. Plaintiffs' Exhibit 36 consists of the property records of each school in the district and shows original investment costs and subsequent site improvement and equipment costs for each of the schools.

13. Defendants' Exhibit 1 is a map of Corpus Christi showing the location and geographic attendance zone of each elementary school in the district with a tabulation, based upon October 10, 1969 enrollment figures, listing the total number of Negro, Mexican-American, Anglo-American and other ethnic groups enrolled in each school.

14. Defendants' Exhibit 2 is a map of Corpus Christi which shows for junior high schools in the district the same information that defendants' Exhibit 1 shows for the elementary schools (see, note 13, *supra*).

15. Defendants' Exhibit 2-A is a transparent overlay showing the same information as does defendants' Exhibit 2 (see, note 14, *supra*).

16. Defendants' Exhibit 3 is a map of Corpus Christi which shows for the senior high schools in the district the same information that defendants' Exhibit 1 shows for the elementary schools (see, note 13, *supra*).

17. Defendants' Exhibit 3-A is a transparent overlay which shows the same information as does defendants' Exhibit 3 (see, note 16, *supra*).

18. Defendants' Exhibit 4 is a tabular summary which shows as to each school the ethnic distribution of the district's teaching staff and pupils as of October 10, 1969. (see footnote 37, *infra*).

19. Defendants' Exhibit 5 is a tabular breakdown which shows for school year 1968-1969 the same information that defendants' Exhibit 5 shows for the 1969-1970 school year (see, note 18, *supra*).

20. Defendants' Exhibit 6 shows the 1954-1966 Census totals of the district's white and Negro children of each school age and pre-school age.

21. Defendants' Exhibit 7 shows the total number and percent of the total student population in each school of Anglo-Americans, Spanish surnamed Americans and Negro-Americans for the 1954-55 school year, of white and Negro in school year 1957-58 and of white and Negro for school year 1961-62.

22. Defendants' Exhibit 9 is a letter dated May 12, 1970 from the district's department of personnel to its superintendent which indicates the following: the number of Mexican-American, Negro, and Anglo-American professional personnel employed as principals, counselors, and other specialists (other than regular classroom teachers); the number and percent of Anglo-Americans, Mexican-Americans and Negroes employed by the district in 1955-56, 1965-66, and 1969-70; the num-

The plaintiffs' and defendants' exhibits as mentioned mainly include objective evidentiary data over which there is no dispute, as I understand the parties, but I do understand that each side contends there are different factual and legal implications and conclusions to be drawn from this objective, statistical evidence which the court, of course, will have to decide. As to the other exhibits, the court will consider them and give to them whatever weight and credibility, as well as relevancy, the court feels they deserve in deciding the factual and legal issues involved.

Finally, the court recognizes that experts, similarly trained, similarly educated, and with good intentions, do disagree over fundamental issues.[26] And

ber of Anglo-American, Mexican-American and Negro teachers interviewed at specified colleges in 1955–56, in the spring of 1970, and from February 17th through May 8 of 1969; and, the total number to whom offers of employment have been made to each ethnic or racial group, with the offers also expressed in terms of the percentage relative to the total number of persons interviewed.

23. Defendants' Exhibit 10 is a tabulation which shows the number of classrooms available in each school for school year 1970–71. The exhibit was prepared May 18, 1970.

24. Defendants' Exhibit 11 is a copy of the Open Housing Ordinance adopted by the City of Corpus Christi on September 4, 1968.

25. Defendants' Exhibits 14, 15 and 16 are large student density maps of the district for elementary, junior high and senior high schools, respectively without regard to whether such students are Negro, Anglo-American or Mexican-American. These exhibits were not offered into evidence and, therefore, the court withdraws its consideration of them in this case. But the record is replete with other evidence, showing substantially the same information, which was offered and admitted into evidence.

26. One particularly notable example is the differences in the views held by Dr. Lawrence D. Haskew, Professor of Education and Administration at the University of Texas at Austin, and by Dr. Thomas P. Carter, Professor of Education and Sociology at the University of Texas at El Paso. While both witnesses advocated removing all vestiges of discrimination against any group as soon as practicably possible and to create a society in which every one participates fully and on an equal basis, their thoughts on how this goal should be achieved were directly at odds with one another. Dr. Haskew, testifying for the defendants in favor of the "neighborhood school concept," stated that the neighborhood school has a much better opportunity to eliminate ethnic and racial barriers than almost anything else. Tr. p. 1220. In response to questions directed to the issue of whether this would be true in the case of where, because of residential segregation or otherwise, a neighborhood school system would cause the children to attend substantially segregated schools, Dr. Haskew replied affirmatively, stating that "education conducted for people in ghettos is the best route * * *" Tr. p. 1223. He testified that the important consideration is the quality of the education that is being offered, not where it is offered, and that if the education offered in the disadvantaged, segregated neighborhood makes the student mobile, in the sense of affording him abilities, he will be able to escape from the disadvantaged, segregated environment, provided also that the channels of society are opened to him. Dr. Haskew saw little benefit in transporting students from one area to another merely so that for only about eight hours a day they would be in an integrated environment. Dr. Carter, on the other hand, testified that to overcome existing patterns of ethnic or racial discrimination and to create equal societal participation by such ethnic or racial groups, integrating these groups in the schools is of overriding importance. Dr. Carter testified that as long as an ethnic or racial group is, through segregation, discriminated against in school, an indelible stigma is attached to belonging to that group and equal status interaction is foreclosed. In breaking down these racial or ethnic barriers, he emphasized that school integration can play a very significant role by stimulating social interaction between the various racial and ethnic groups and by broadening a child's reference or peer group to include persons of the other ethnic or racial group. Dr. Carter testified that while integrating the schools provides an environment that is more conducive to academic achievement by the disadvantaged group, this factor is of secondary significance in comparison to the broader

that is not only true in the field of education, but this court sees it every day when we have trials with experts, where they disagree over the most basic and fundamental issues. And there have been some disagreements manifested during this trial that just could not be reconciled and the court must use its own judgment to see that justice is done after carefully considering all of the evidence. Although there has been a somewhat lack of basic empirical evidence which has been validated or demonstrated by experience or results, and the educators spoke of that often during the trial, the court must decide this case on the evidence before it.

Now to the issues in the case. It appears to the court that the controlling and ultimate issues, stated in general terms, are as follows:

First, can Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and its progeny apply to Mexican-Americans in the Corpus Christi Independent School District; or, stated in another way, is Brown limited to Negroes only?

Second, if Brown can apply to Mexican-Americans, does it under the facts of this case? Stated in another way, assuming Brown applies to Mexican-Americans, are the Mexican-American students segregated or in a dual school system?

Third, because I think most of us agree that the Negroes in Corpus Christi are protected by the Fourteenth Amendment to the Constitution under Brown, as it was a case involving black and whites, and later Supreme Court and Fifth Circuit cases, the question or issue here is: do we have a dual or unitary school system as it affects Negroes in Corpus Christi?

Further, or fourth, if we do have a dual school system here as defined by recent Fifth Circuit cases, and that Negroes and Mexican-Americans are denied their Constitutional rights under the Fourteenth Amendment, is this a de jure or de facto dual or segregated school system?

And finally, if we do have a dual system, how can the court, and under what plans and programs, disestablish a dual school system and establish and maintain a unitary school system in contemplation and compliance with the recent Supreme Court and Fifth Circuit opinions?

And so, in determining the first general issue in this case, which is whether Brown can apply to Mexican-Americans in the Corpus Christi Independent School District, the court now makes the following observations concerning the implications of Brown to this issue: This court reads Brown to mean that when a state undertakes to provide public school education, this education must be made available to all students on equal terms, and that segregation of any group of children in such public schools on the basis of their being of a particular race, color, national origin, or of some readily identifiable, ethnic-minority [27] group, or class deprives these

---

educational interests served—the stimulation and facilitation of equal-status interaction and the creation of mutual understanding and acceptance.

27. To avoid any misunderstanding of the court's use of the adjective "minority" throughout its oral opinion in its references to the ethnic group or groups to which the Brown school case rationale is applicable, some further comment is probably warranted. The court used the term "minority" simply because the case involves ethnic groups that are numerically in the minority. Nationally, Mexican-American and Negro populations are decidedly in the minority (see, chart in footnote 31, infra). They are each also in the minority within the Corpus Christi Independent School District (see footnote 30, infra), although the district's Mexican-American population perhaps is presently a minority only marginally. The court recognizes that either group may represent a majority in the United States at some time in the future, that each group undoubtedly presently represents a majority in some communities and areas of the country, and that either group may someday represent a majority in the Corpus Christi Independent School District. Even today, if considered together, the

children of the guarantees of the Fourteenth Amendment as set out in *Brown,* and subsequent decisions, even though the physical facilities and other tangible factors may be equal. Although these cases speak in terms of race and color, we must remember that these cases were only concerned with blacks and whites. But it is clear to this court that these cases are not limited to race and color alone.[28]

Negro and Mexican-American residents of Corpus Christi somewhat outnumber the rest of the city's population. But whether or not a group represents a numeric minority or majority of a certain population is not the controlling inquiry. In the context of the present case, the relevant inquiry is whether the Mexican-Americans and Negroes residing within the Corpus Christi Independent School District are, as a group, or groups, being discriminated against in the schools through segregation, not whether they represent a majority or a minority of the district's population. By simply being, or becoming a majority of the population of the relevant area will not, by itself, prevent, or remove the vestiges of, discrimination against that group, whether in the schools (through segregation) or otherwise. Political and economic power promise the only meaningful non-judicial protection against such discrimination. Simply constituting a plurality of the relevant population does not mean, although it may, that the group has the necessary economic power. Nor is the potential political power possessed by a group constituting a plurality necessarily effectively exercised through the election of adequate political representation. Without either economic or political power, admittance into existing power structures is seldom possible. When a group, as a whole is politically impotent and economically disadvantaged, it invariably will find itself subordinated, in one respect or other, to those who are politically and economically stronger. It seems logical enough to assume that the larger a disadvantaged group is, or becomes, the more political and economic power it acquires, and, consequently the less susceptible it is to domination, repression, discrimination, or control by the more advantaged groups in the society. But this will always be only a difference in degree, for as long as political and economic power are concentrated in certain groups, to the exclusion of others, the disadvantaged group will be discriminated against or repressed, whether blatantly or subtlely, in one form or another. When this occurs in the public schools, through the establishment of a substantially segregated school system in which the children of the disadvantaged group or groups generally attend schools that the children of the more advantaged group or groups do not attend, a problem of constitutional magnitude is presented. See footnote 30, *infra.*

The court's rationale, similar to that announced in Hobson v. Hansen, 269 F. Supp. 401 (D.D.C.1967), requires that two judicial determinations be made: (1) which groups in the school district in question are underprivileged and politically and economically disadvantaged; and (2) which, if any, of these groups are being unreasonably segregated in the district's schools? In the present case, the evidence has shown that the Negroes and Mexican-Americans residing within the Corpus Christi Independent School District are underprivileged and politically and economically disadvantaged and are both unreasonably segregated in the district's schools.

Obviously, the groups that qualify under the announced test will vary in time and place: some racial or ethnic groups presently underprivileged and disadvantaged may in the future achieve equal or even dominant social status; some racial or ethnic groups that are underprivileged and politically and educationally disadvantaged in some communities may represent the dominant and advantaged segment of others; and, of course, even though a group may be underprivileged and disadvantaged in a particular school district, the group may be integrated in the schools of that district with the more advantaged segments of the community to such an extent that the requisite harmful effect is lacking. The present case concerns only the Negro and Mexican-American residents in the Corpus Christi Independent School District and concerns conditions there only as they now exist. Conditions elsewhere undoubtedly vary, and the situation here may be different in the future.

28. Through the years an "education" has come to be recognized as being a critically important interest, similar to the right to vote, fundamental to a meaningful participation in a democratic society. The *Brown* school decision, and subsequent cases, represent a judicial recognition of the constitutional significance of this interest, expressing it in terms of equal educational opportunity under the equal protection clause of the Fourteenth

In this case, if the proof shows that the Mexican-Americans in the Corpus Christi Independent School District are an identifiable, ethnic-minority [29] group, and for this reason have been segregated and discriminated against in the schools in the manner that *Brown* prohibits, then they are certainly entitled to all the protection announced in *Brown*. Thus *Brown* can apply to Mexican-American students in public schools.

Having decided that *Brown* can apply to Mexican-American students in public

schools, the court now must determine whether under the facts of this case the Mexican-American students in the Corpus Christi Independent School District do fall within the protection of *Brown*.

■ ■ The court finds from the evidence that these Mexican-American students are an identifiable, ethnic-minority [30] class sufficient to bring them within the protection of *Brown*.

It is clear to this court that Mexican-Americans, or Americans with Spanish

Amendment. As stated by Mr. Chief Justice Warren in the *Brown* decision:

"[Education] is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment."

347 U.S. 483, 493, 74 S.Ct. 686, 691 (1954). These words were never truer than they are today. For this reason, state and local school policies are being tested ever more closely in terms of Constitutional equal protection.

Some may argue that the Fourteenth Amendment's historic concern for the Negro [cf. The Slaughter House Cases, 83 U.S. (16 Wall) 36, 71–72, 21 L.Ed 394, (1873)] and the Negro's long history of political and economic disadvantagement provide a rational basis for affording the Negro with a broader right under the Fourteenth Amendment in the area of educational opportunity. This court rejects such reasoning as being patently unsound. Any other group which is similarly or perhaps equally, disadvantaged politically and economically, and which has been substantially segregated in public schools, should receive no less effective constitutional protection of this important right.

It was decided as early as 1886 that although the Fourteenth Amendment may have been primarily concerned with Negroes, its protection is certainly not limited to them. Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220. And to reason that even though it applies to other groups, its applicability to other groups is of a more limited and restricted nature, would require one to assume that the Negro is invariably and significantly less able to obtain equal jus-

tice in the political arena than is any other group. First of all, the assumption is entirely unjustified. At best this would be a factual issue, and in this case the evidence does not warrant an affirmative answer to such an inquiry. Even if the evidence had shown that the Negro is less able to obtain equal justice in the political arena than any other politically and economically disadvantaged group, the court would not consider this a sufficient basis for concluding that the former group's rights under the Fourteenth Amendment should be more pervasive or extensive than another's group's rights.

It is possible that Negroes may have disabilities resulting from phychological conditions caused by their long history of slavery and by governmental and private discrimination. Also the discrimination directed against the Negro may be more intransigent than the discrimination directed against any other group. If so, perhaps there is at least a conceivable basis for distinguishing the Negro from other groups with respect to the Constitutional protection that should be afforded. But the evidence in this case indicates that, at least in the Corpus Christi Independent School District, no less protection should be fashioned for the district's Mexican-Americans than for its Negroes, for the Mexican-Americans residing in this district have experienced deprivations and discriminations similar to those suffered by the district's Negroes, and they share with the Negro the special problems involved in overcoming existing divisive conditions and the stigma and disadvantage that have accompanied their segregation.

29. See note 27, *supra*.

30. *Id*. When asked whether the Mexican-Americans are an identifiable group in the context of the issues raised in this case, Dr. Thomas Carter, whose qualifications as an expert witness on this point

surnames, or whatever they are called, or whatever they would like to be called, Latin-Americans, or several other new names of identification—and parenthetically the court will take notice that this naming for identification phenomena is similar to that experienced in the Negro groups: black, Negro, colored, and now black again, with an occasional insulting epithet that is used less and less by white people in the South, fortunately. Occasionally you hear the word "Mexican" still spoken in a derogatory way in the Southwest—it is clear to this court that these people for whom we have used the word Mexican-Americans to describe their class, group, or segment of our population, are an identifiable ethnic-minority in the United States, and especially so in the Southwest,[31] in Texas [32]

are set forth in footnote 38, *infra*, testified as follows:

A. I find that a very peculiar question. The United States census, United States Government, The Texas Government, everyone considers this a minority, and an ethic minority or a cultural minority. In social science, a minority is a group of people who may be a physical majority, but a minority is a group of people who are not full participants in the dominant society. In other words, there is discrimination. They don't fill their proportional number of doctors, lawyer, merchant, and chief kind of slot in the society. They have been established in a—particularly in Texas, it has been established that many laws were discriminatory against Mexican-Americans. So both from a legal point of view, a Government point of view, and a social-science point of view, they are a minority.

Looking at it culturally, they are an identifiably different group with adherence to the Spanish language, certain physical characteristics that are more or less Indian or mistisaje or the blending of the Spanish and the Mexican. So, no matter how you cut it, you are going to come out as a minority, both from social-science and from the legal point of view, and from the cultural point of view, and the racial point of view.

THE COURT: What was the last one?

THE WITNESS: And the racial point of view.

I have heard that question raised before.

Q. It wasn't mine originally, Dr. Carter. When you say that they are an ethnic group from the social point of view, does that include, for example, income status?

A. Yes. Again, a minority, from a social scientist's point of view, is any group of people that do not participate proportionately with their number in the different occupation levels or income levels or residential distribution within a community. Any one of those factors can be considered a characteristic of a minority.

Tr. pp. 52–53.

\* \* \* \* \*

Q. In your studies, have you discovered differences in the Anglo-Saxon culture emanating from Western Europe and England, and the Mexican culture?

A. Well, of course, a great body of literature exists that differentiates the two. My own thinking on this is that we have exaggerated the difference, and the difference was much greater in the past. But the two traditions, the Mexicans or the Indian-Spanish tradition of the south of the border, and the Protestant-English tradition do represent two identifiably different cultural trends.

Again, I think it was more obvious in the past than it is now, but most assuredly there have been many studies that will identify cultural characteristics of both groups, or any other number of groups also.

Tr. p. 54.

31. The court takes judicial notice of the 1960 U. S. Census of Population and a special study by the Bureau of the Census, entitled Persons of Spanish Surname, which was based upon the 1960 Census. These two documents indicate the following with respect to the 5 Southwestern States, where the populations in this country of persons with Spanish surnames are the greatest:

| 1. 1960 Census | Spanish Surname | Total Population |
|---|---|---|
| Arizona | 194,356 | 1,302,161 |
| California | 1,426,538 | 15,717,204 |
| Colorado | 157,174 | 1,753,947 |
| New Mexico | 269,122 | 951,023 |
| Texas | 1,417,810 | 9,579,677 |
| 2. 1950 Census: | | |
| Arizona | 128,580 | 749,587 |
| California | 758,400 | 10,586,223 |
| Colorado | 118,715 | 1,325,089 |
| New Mexico | 248,560 | 681,187 |
| Texas | 1,027,455 | 7,711,194 |

32. See the figures for Texas that are contained in the preceding footnote.

and in Corpus Christi.[33] This is not surprising; we can notice and identify their physical characteristics, their language, their predominant religion, their distinct culture, and, of course, their Spanish surnames. And if there were any doubt in this court's mind, this court could take notice, which it does, of the congressional enactments, governmental studies and commissions on this problem.[34] And also, the opinions, such as Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866, a 1954 case; Judge Allred's decision in the case, Hernandez v. The Driscoll Consolidated Independent School District, Civil Action No. 13840, unpublished; Keyes, et al., v.

School District Number 1,[35] the Westminister School of Orange County v. Mendez, 161 F.2d 774 (9 Circuit, 1947); and also, and very importantly, the recent Federal Government's intervention in Marcos Perez, et al., v. The Sonora Independent School District, Number 6–224 Civil, San Angelo Division of the Northern District of Texas.

This court further finds that the Mexican-American students in the Corpus Christi Independent School District are now separated and segregated to a degree prohibited by the Fourteenth Amendment [36] in all three levels of the school system: elementary, junior high, and senior high.[37]

33. Plaintiffs' Exhibit 8, a copy of the 1960 Corpus Christi, Texas Census as officially compiled by the Bureau of the Census shows the following 1960 population totals with respect to Nueces County and Corpus Christi:

| | Nueces County | | |
| --- | --- | --- | --- |
| | Total | Corpus Christi | Balance |
| White (other than Spanish Surname) | 126,794 | 98,504 | 28,290 |
| Negro | 10,108 | 9,156 | 952 |
| Other races | 285 | 171 | 114 |
| White: Spanish Surname | 84,386 | 59,859 | 24,527 |
| Total Population | 221,573 | 167,690 | 53,883 |

34. Title IV of the Civil Rights Act of 1964, 42 § 2000c et seq.; Hearing Before the United States Commission on Civil Rights, held in San Antonio, Texas (December 9–14, 1968); Report I: Ethic Isolation of Mexican-American in Public Schools of the Southwest, Mexican-American Educational Study, United States Comm'n on Civil Rights (August 1970); 45 C.F.R. Part 80, H.E.W.Dept'l Reg. (January 1, 1970) (purpose of which is to effectuate provisions of Title VI of the Civil Rights Act of 1964 to the end that no person in the U. S. shall, on the ground of race, color, or national origin, be subjected to discrimination under any program or activity receiving financial assistance from the Department of H.E. W.); the Congressional creation of the Committee on Opportunities for Spanish Speaking People, P.L. 91–181, 83 Stat. 838 (1969) (the purpose of which is to help assure that Federal programs are

reaching this group, to provide assistance it needs, and to seek out new programs that may be necessary to handle problems that are unique to such persons—who represent one of the nation's largest minorities).

35. 303 F.Supp. 279 (D.Colo.), remanded, mod., 303 F.Supp. 289 (D.Colo.), vacated, (10th Cir.), reinstated, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 37 (1969).

36. The summarizations of pertinent evidence in footnotes 37, 38 and 39, *infra*, clearly show that the Mexican-American students are substantially separated and segregated from the remainder of the district's student population. The accompanying textual statement that this condition constitutes constitutionally impermissible segregation is a conclusion based upon this fact of segregation, plus certain additional considerations which are set forth in the text and accompanying footnotes following this statement.

37. Plaintiffs' Exhibit 3–A and defendants' Exhibit 4 are tabular summaries of the ethnic distribution of the students and teaching staff in each of the various schools in the district for the 1969–70 school year, reflecting the number of students and teachers, by ethnic groups, at each high school, junior high school and elementary school. The breakdown of the student and teacher distribution is also given by percentages. The numbers are totaled for each level of school, and totals for the entire district are also given. Because the two exhibits reflect the same information, with only insignificant differences in the tabulations, only defendants' Exhibit 4 is reproduced here.

EXHIBIT 4
CORPUS CHRISTI PUBLIC SCHOOLS
Corpus Christi, Texas
ETHNIC DISTRIBUTION 1969–1970
Teaching Staff and Pupils
As of October 10, 1969

| School | | American Indian No. | % | Oriental No. | % | Negro No. | % | Spanish Sur-name Amer. No. | % | Anglo American No. | % | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carroll | P | — | — | 2 | 0.10 | — | — | 416 | 21.05 | 1558 | 78.85 | 1976 |
| | T | — | — | — | — | — | — | 6 | 6.52 | 86 | 93.48 | 92 |
| King | P | — | — | — | — | 5 | 0.24 | 193 | 9.23 | 1893 | 90.53 | 2091 |
| | T | — | — | — | — | — | — | 7 | 7.29 | 89 | 92.71 | 96 |
| Miller | P | — | — | — | — | 282 | 13.70 | 1351 | 65.61 | 426 | 20.69 | 2059 |
| | T | — | — | — | — | 3 | 3.09 | 16 | 16.50 | 78 | 80.41 | 97 |
| Moody | P | — | — | — | — | 168 | 10.57 | 1363 | 85.78 | 58 | 3.65 | 1589 |
| | T | — | — | — | — | 5 | 6.49 | 14 | 18.18 | 58 | 75.33 | 77 |
| Ray | P | — | — | 3 | 0.14 | 4 | 0.19 | 502 | 23.61 | 1617 | 76.06 | 2126 |
| | T | — | — | — | — | — | — | 4 | 4.04 | 95 | 95.96 | 99 |
| Total | P | — | — | 5 | 0.05 | 459 | 4.66 | 3825 | 38.87 | 5552 | 56.42 | 9841 |
| Sr. Highs | T | — | — | — | — | 8 | 1.73 | 47 | 10.20 | 406 | 88.07 | 461 |
| Baker | P | — | — | 1 | 0.09 | 3 | 0.26 | 276 | 24.30 | 856 | 75.35 | 1136 |
| | T | — | — | — | — | 2 | 3.92 | 10 | 19.61 | 39 | 76.47 | 51 |
| Barnes | P | — | — | — | — | 36 | 3.30 | 1023 | 94.03 | 29 | 2.67 | 1088 |
| | T | — | — | — | — | 3 | 5.77 | 20 | 38.46 | 29 | 55.77 | 52 |
| Browne | P | — | — | — | — | — | — | 74 | 8.68 | 779 | 91.32 | 853 |
| | T | — | — | — | — | 1 | 2.44 | 7 | 17.07 | 33 | 80.49 | 41 |
| Coles | P | — | — | — | — | 218 | 36.95 | 342 | 57.97 | 30 | 5.08 | 590 |
| | T | — | — | — | — | 4 | 11.77 | 12 | 35.29 | 18 | 52.94 | 34 |
| Cullen | P | — | — | — | — | — | — | 66 | 6.18 | 1002 | 93.82 | 1068 |
| | T | — | — | — | — | — | — | 6 | 12.00 | 44 | 88.00 | 50 |
| Cunningham | P | — | — | — | — | 147 | 10.21 | 1267 | 87.99 | 26 | 1.80 | 1440 |
| | T | — | — | — | — | 2 | 3.03 | 13 | 19.70 | 51 | 77.27 | 66 |
| Driscoll | P | — | — | — | — | 190 | 18.23 | 460 | 44.15 | 392 | 37.62 | 1042 |
| | T | — | — | — | — | 2 | 4.08 | 11 | 22.45 | 36 | 73.47 | 49 |
| Haas | P | — | — | 2 | 0.35 | — | — | 63 | 10.99 | 508 | 88.66 | 573 |
| | T | — | — | — | — | — | — | 5 | 16.67 | 25 | 83.33 | 30 |
| Hamlin | P | — | — | — | — | — | — | 90 | 7.75 | 1072 | 92.25 | 1162 |
| | T | — | — | — | — | 1 | 2.00 | 4 | 8.00 | 45 | 90.00 | 50 |
| South Park | P | — | — | 1 | 0.10 | 8 | 0.79 | 609 | 59.82 | 400 | 39.29 | 1018 |
| | T | — | — | — | — | 1 | 2.22 | 8 | 17.78 | 36 | 80.00 | 45 |
| Sundeen | P | — | — | — | — | 8 | 1.28 | 135 | 21.60 | 482 | 77.12 | 625 |
| | T | — | — | — | — | 1 | 3.03 | 1 | 3.03 | 31 | 93.94 | 33 |
| Wynn Scale | P | — | — | — | — | 9 | 0.75 | 1103 | 92.07 | 86 | 7.18 | 1198 |
| | T | — | — | — | — | 2 | 3.63 | 13 | 23.64 | 40 | 72.73 | 55 |
| Total | P | — | — | 4 | 0.03 | 619 | 5.25 | 5508 | 46.71 | 5662 | 48.01 | 11793 |
| Jr. Highs | T | — | — | — | — | 19 | 3.42 | 110 | 19.78 | 427 | 76.80 | 556 |
| Allen | P | — | — | — | — | 6 | 0.67 | 827 | 91.99 | 66 | 7.34 | 899 |
| | T | — | — | — | — | 1 | 2.94 | 9 | 26.47 | 24 | 70.59 | 34 |
| Austin | P | — | — | — | — | — | — | 766 | 97.70 | 18 | 2.30 | 784 |
| | T | — | — | — | — | 1 | 3.34 | 10 | 33.33 | 19 | 63.33 | 30 |
| Beach | P | — | — | — | — | — | — | 76 | 55.88 | 60 | 44.12 | 136 |
| | T | — | — | — | — | — | — | 2 | 33.33 | 4 | 66.67 | 6 |
| Calk | P | — | — | — | — | — | — | 85 | 14.89 | 486 | 85.11 | 571 |
| | T | — | — | — | — | — | — | 1 | 5.00 | 19 | 95.00 | 20 |
| Carroll Lane | P | — | — | — | — | 1 | 0.18 | 130 | 23.21 | 429 | 76.61 | 560 |
| | T | — | — | — | — | — | — | 3 | 14.29 | 18 | 85.71 | 21 |
| Casa Linda | P | — | — | — | — | — | — | 147 | 35.68 | 265 | 64.32 | 412 |
| | T | — | — | — | — | — | — | 1 | 6.25 | 15 | 93.75 | 16 |
| Central Park | P | 1 | 0.13 | 2 | 0.27 | 2 | 0.27 | 241 | 32.09 | 505 | 67.24 | 751 |
| | T | — | — | — | — | 1 | 3.70 | 1 | 3.70 | 25 | 92.60 | 27 |
| Chula Vista | P | — | — | — | — | — | — | 540 | 96.60 | 19 | 3.40 | 559 |
| | T | — | — | — | — | 1 | 4.76 | 7 | 33.33 | 13 | 61.91 | 21 |
| Crockett | P | — | — | — | — | 46 | 6.39 | 653 | 90.69 | 21 | 2.92 | 720 |
| | T | — | — | — | — | — | — | 7 | 26.92 | 19 | 73.08 | 26 |
| Crossley | P | — | — | — | — | 377 | 80.38 | 88 | 18.76 | 4 | 0.86 | 469 |
| | T | — | — | — | — | 2 | 9.52 | 9 | 42.86 | 10 | 47.62 | 21 |
| Evans | P | — | — | — | — | 28 | 6.48 | 402 | 93.06 | 2 | 0.46 | 432 |
| | T | — | — | — | — | 1 | 5.56 | 6 | 33.33 | 11 | 61.11 | 18 |
| Fannin | P | — | — | — | — | 3 | 0.40 | 474 | 63.71 | 267 | 35.89 | 744 |
| | T | — | — | — | — | 1 | 3.57 | 5 | 17.86 | 22 | 78.57 | 28 |

| School | | American Indian | | Oriental | | Negro | | Spanish Sur-name Amer. | | Anglo American | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | No. | % | No. | % | No. | % | No. | % | No. | % | |
| Fisher | P | — | — | 1 | 0.22 | — | — | 59 | 12.85 | 399 | 86.93 | 459 |
| | T | — | — | — | — | — | — | 1 | 4.76 | 20 | 95.24 | 21 |
| Fraser | P | — | — | — | — | — | — | 90 | 14.78 | 519 | 85.22 | 609 |
| | T | — | — | — | — | 1 | 4.55 | 1 | 4.55 | 21 | 90.90 | 23 |
| Furman | P | — | — | — | — | 7 | 1.19 | 522 | 88.93 | 58 | 9.88 | 587 |
| | T | — | — | — | — | — | — | 3 | 13.64 | 19 | 86.36 | 22 |
| Garcia | P | — | — | — | — | 126 | 27.81 | 327 | 72.19 | — | — | 453 |
| | T | — | — | — | — | 2 | 11.76 | 4 | 23.53 | 11 | 64.71 | 17 |
| Gibson | P | — | — | — | — | — | — | 56 | 17.95 | 256 | 82.05 | 312 |
| | T | — | — | — | — | — | — | 2 | 14.29 | 12 | 85.71 | 14 |
| Houston | P | — | — | — | — | 2 | 0.29 | 327 | 47.81 | 355 | 51.90 | 684 |
| | T | — | — | — | — | — | — | 3 | 11.11 | 24 | 88.89 | 27 |
| Kostoryz | P | — | — | 2 | 0.27 | — | — | 262 | 36.14 | 461 | 63.59 | 725 |
| | T | — | — | — | — | 1 | 3.85 | 3 | 11.54 | 22 | 84.61 | 26 |
| Lamar | P | — | — | — | — | 6 | 1.12 | 530 | 98.70 | 1 | 0.18 | 537 |
| | T | — | — | — | — | 1 | 4.76 | 5 | 23.81 | 15 | 71.43 | 21 |
| Lexington | P | — | — | 2 | 0.41 | — | — | 274 | 56.26 | 211 | 43.33 | 487 |
| | T | — | — | — | — | — | — | 2 | 10.53 | 17 | 89.47 | 19 |
| Los Encinos | P | — | — | — | — | 41 | 12.46 | 245 | 74.47 | 43 | 13.07 | 329 |
| | T | — | — | — | — | 1 | 7.70 | 4 | 30.77 | 8 | 61.53 | 13 |
| Lozano | P | — | — | — | — | 43 | 6.11 | 660 | 93.75 | 1 | 0.14 | 704 |
| | T | — | — | — | — | 1 | 3.85 | 13 | 50.00 | 12 | 46.15 | 26 |
| Meadowbrook | P | 1 | 0.17 | — | — | — | — | 50 | 8.46 | 540 | 91.37 | 591 |
| | T | — | — | — | — | 1 | 4.55 | 4 | 18.18 | 17 | 77.27 | 22 |
| Menger | P | — | — | — | — | 5 | 1.16 | 152 | 34.78 | 280 | 64.07 | 437 |
| | T | — | — | — | — | — | — | 3 | 16.67 | 15 | 83.33 | 18 |
| Montclair | P | — | — | 2 | 0.29 | — | — | 35 | 5.02 | 660 | 94.69 | 697 |
| | T | — | — | — | — | — | — | 1 | 4.00 | 24 | 96.00 | 25 |
| Moore | P | — | — | — | — | — | — | 155 | 30.88 | 347 | 69.12 | 502 |
| | T | — | — | — | — | 1 | 5.26 | 2 | 10.53 | 16 | 84.21 | 19 |
| Oak Park | P | 1 | 0.15 | — | — | 71 | 10.26 | 375 | 54.19 | 245 | 35.40 | 692 |
| | T | — | — | — | — | 1 | 4.00 | 3 | 12.00 | 21 | 84.00 | 25 |
| Parkdale | P | — | — | — | — | — | — | 113 | 18.20 | 508 | 81.80 | 621 |
| | T | — | — | — | — | — | — | 3 | 12.50 | 21 | 87.50 | 24 |
| Prescott | P | — | — | — | — | 9 | 1.50 | 571 | 95.33 | 19 | 3.17 | 599 |
| | T | — | — | — | — | 1 | 4.35 | 8 | 34.78 | 14 | 60.87 | 23 |
| Sanders | P | — | — | — | — | — | — | 15 | 4.56 | 314 | 95.44 | 329 |
| | T | — | — | — | — | 1 | 7.69 | 2 | 15.39 | 10 | 76.92 | 13 |
| Savage | P | — | — | — | — | — | — | 152 | 43.06 | 201 | 56.94 | 353 |
| | T | — | — | — | — | — | — | 2 | 13.33 | 13 | 86.67 | 15 |
| Schanen | P | — | — | 1 | 0.17 | — | — | 20 | 3.28 | 588 | 96.55 | 609 |
| | T | — | — | — | — | 1 | 4.35 | 3 | 13.04 | 19 | 82.61 | 23 |
| Shaw | P | — | — | — | — | 144 | 18.49 | 623 | 79.97 | 12 | 1.54 | 779 |
| | T | — | — | — | — | 2 | 6.06 | 7 | 21.21 | 24 | 72.73 | 33 |
| Smith | P | — | — | — | — | 5 | 1.03 | 61 | 12.66 | 416 | 86.31 | 482 |
| | T | — | — | — | — | 1 | 5.56 | 1 | 5.56 | 16 | 88.88 | 18 |
| Southgate | P | — | — | 1 | 0.22 | 16 | 3.51 | 439 | 96.27 | — | — | 456 |
| | T | — | — | — | — | 2 | 10.00 | 8 | 40.00 | 10 | 50.00 | 20 |
| Travis | P | — | — | — | — | 1 | 0.10 | 911 | 90.74 | 92 | 9.16 | 1004 |
| | T | — | — | — | — | 1 | 2.78 | 7 | 19.44 | 28 | 77.78 | 36 |
| Washington | P | — | — | — | — | 448 | 94.71 | 25 | 5.29 | — | — | 473 |
| | T | — | — | — | — | 6 | 30.00 | 1 | 5.00 | 13 | 65.00 | 20 |
| Wilson | P | — | — | — | — | — | — | 20 | 3.63 | 531 | 96.37 | 551 |
| | T | — | — | — | — | 1 | 4.55 | 1 | 4.55 | 20 | 90.90 | 22 |
| Windsor Park | P | — | — | — | — | — | — | 62 | 13.81 | 387 | 86.19 | 449 |
| | T | — | — | — | — | — | — | 1 | 5.88 | 16 | 94.12 | 17 |
| Woodlawn | P | — | — | — | — | 5 | 0.86 | 62 | 10.71 | 512 | 88.43 | 579 |
| | T | — | — | — | — | 1 | 4.55 | 2 | 9.09 | 19 | 86.36 | 22 |
| Yeager | P | — | — | — | — | — | — | 32 | 6.70 | 446 | 93.30 | 478 |
| | T | — | — | — | — | 1 | 5.00 | 3 | 15.00 | 16 | 80.00 | 20 |
| Zavala | P | — | — | — | — | 2 | 0.28 | 687 | 95.68 | 29 | 4.04 | 718 |
| | T | — | — | — | — | 1 | 3.45 | 7 | 24.14 | 21 | 72.41 | 29 |
| Driscoll Hospital | P | — | — | — | — | 1 | 16.67 | 5 | 88.33 | — | — | 6 |
| | T | — | — | — | — | — | — | — | — | 1 | 100.00 | 1 |
| Ada Wilson | P | — | — | — | — | 2 | 3.28 | 40 | 65.57 | 19 | 31.15 | 61 |
| | T | — | — | — | — | — | — | — | — | 3 | 100.00 | 3 |
| Total Elementary | P | 3 | 0.01 | 11 | 0.04 | 1397 | 5.73 | 12386 | 50.78 | 10592 | 43.44 | 24389 |
| | T | — | — | — | — | 37 | 3.92 | 171 | 18.09 | 737 | 77.99 | 945 |

Cite as 324 F.Supp. 599 (1970)

## CORPUS CHRISTI PUBLIC SCHOOLS
### Corpus Christi, Texas

#### ETHNIC DISTRIBUTION TOTALS 1969–1970

| | | American Indian | | Oriental | | Negro | | Spanish Sur-Name Amer. | | Anglo American | | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | No. | % | No. | % | No. | % | No. | % | No. | % | |
| Totals | | | | | | | | | | | | |
| Senior High | Pupils | — | — | 5 | 0.05 | 459 | 4.66 | 3,825 | 38.87 | 5,552 | 56.42 | 9,841 |
| | Teachers | — | — | — | — | 8 | 1.73 | 47 | 10.20 | 406 | 88.07 | 461 |
| Junior High | Pupils | — | — | 4 | 0.03 | 619 | 5.25 | 5,508 | 46.71 | 5,562 | 48.01 | 11,793 |
| | Teachers | — | — | — | — | 19 | 3.42 | 110 | 19.78 | 427 | 76.80 | 556 |
| Elementary | Pupils | 3 | 0.01 | 11 | 0.04 | 1,397 | 5.73 | 12,386 | 50.78 | 10,592 | 43.44 | 24,389 |
| | Teachers | — | — | — | — | 37 | 3.92 | 171 | 18.09 | 737 | 77.99 | 945 |
| Total | | | | | | | | | | | | |
| All Schools | Pupils | 3 | 0.01 | 20 | 0.04 | 2,475 | 5.38 | 21,719 | 47.19 | 21,806 | 47.38 | 46,023 |
| | Teachers | — | — | — | — | 64 | 3.26 | 328 | 16.72 | 1,570 | 80.02 | 1,962 |
| Other Professional Personnel | | — | — | — | — | 1 | | 13 | | 118 | | 132 |
| GRAND TOTAL | Pupils | 3 | 0.01 | 20 | 0.04 | 2,475 | 5.38 | 21,719 | 47.19 | 21,806 | 47.38 | 46,023 |
| | Teachers | — | — | — | — | 65 | | 341 | | 1,688 | | 2,094 |

Defendants' Exhibit 4 indicates: that of the approximately 24,389 elementary students, 43.44% were Anglo-American and 50.78% were Mexican-American; that of the approximately 11,793 junior high school students, 48.01% were Anglo-American and 46.71% were Mexican-American; and that of the approximately 9841 senior high school students, 56.42% were Anglo-American and 38.87% were Mexican-American. If the district's Mexican-American and Anglo-American student populations had been ideally integrated during the school year 1969–70, the percentage of each group's enrollment in each school in the district would have been approximately the same as that group's percentage representation of the total student population in the district for that school level. Even a cursory inspection of the exhibit reproduced above indicates that very few students attended such a school during the last school year. This condition finds graphic expression in plaintiffs' Exhibit 7. This exhibit, summarizing the same numeric data contained in plaintiffs' Exhibit 3–A and defendants' Exhibit 4, shows the following:

a. As to high schools, out of a total enrollment for the 1969–70 school year of approximately 9841 (plaintiffs' exhibit 3–A shows 9836), approximately 1,531 Mexican-Americans and Negroes (less than 200 Negroes) attended schools with more than 90% non-Anglo-American enrollment; approximately 1,633 Mexican-Americans and Negroes (less than 30 Negroes) attended schools with from 70 to 80% non-Anglo-American enrollment; no

high school had 30 to 70% non-Anglo enrollment; approximately 3,175 Anglo-Americans attended schools with only 20 to 30% non-Anglo-American enrollment (922 Mexican-Americans); and approximately 1893 Anglo-Americans attended schools with less than 10% non-Anglo-American enrollment.

b. As to junior high schools, out of a total enrollment for 1969–1970 of approximately 11,793 (plaintiffs' Exhibit 3–A shows 11,789), approximately 4,145 Mexican-American and Negro children (approximately 400 Negroes) attended schools where the non-Anglo-American enrollment was greater than 90%; only about 2,059 students attended schools where the non-Anglo-American enrollment was from 60–70%; no students attended schools where the non-Anglo-American enrollment was from 30–60%; approximately 1338 Anglo-Americans attended schools where the non-Anglo (or Mexican-American) enrollment was only from 20–30%; approximately 508 Anglo-Americans attended schools where the non-Anglo (Mexican-American) enrollment was only 10–20%; and approximately 2,853 Anglo-Americans attended schools where the non-Anglo-American enrollment was less than 10%.

c. As to elementary schools, out of a total enrollment of approximately 24,389, approximately 10,178 Mexican-Americans and Negroes (about 1,250 Negroes) attended schools where over 90% of the enrollment was non-Anglo-American; approximately 3,482 Anglo-Americans attended schools where the non-Anglo-American enrollment was 10–20%; and approximately 3,079 Anglo-Americans at-

It is obvious to the court from the evidence that the Mexican-Americans have been historically discriminated against as a class in the Southwest and in Texas, and in the Corpus Christi District. This court is convinced that this history of discrimination as given by Dr. Thomas Carter,[38] Dr. Hector Garcia,[39] and Mr. Paul Montemayor [40] is substantially correct. Not only do I

tended schools where the non-Anglo-American enrollment was less than 10%.

Although the court has specifically dealt with the 1969–70 school year, the file is replete with other evidence showing that this condition of the Mexican-Americans being substantially segregated in the schools has existed through the years. See, e. g., plaintiffs' Exhibit 3–B and defendants' Exhibit 5 for the 1968–69 school year, plaintiffs' Exhibit 33 for 1967–1968; plaintiffs' Exhibit 8 for 1960; defendants' Exhibit 7 for 1954–1955 and defendants' Exhibit 17 for senior high ethnic composition for school years 1949–1950 through 1967–1968.

Plaintiffs' Exhibits 4–A, 4–B, 4–C, 4–D, 6–A, 6–B, 6–C, 7 (described in footnotes 3, 4, 5, 6, 7, 8, 9 and 10, respectively) and defendants' Exhibits 1, 2, 2–A, 3, 3–A, 4, 5, 6 and 7 (described in footnotes 13, 14, 15, 16, 17, 18, 19, 20 and 21, respectively) also show this condition of substantial racial and ethnic imbalance in the district's schools.

38. Dr. Carter, a Professor of Education and Sociology at the University of Texas at El Paso, has studied extensively the problems of the Mexican-Americans in this country, particularly in Texas, California and the other Southwestern states. His testimony and the court's Exhibit 1 (a vita on Dr. Carter) indicate that among other things, Dr. Carter has published numerous reports and articles on these problems and has published a text entitled *Mexican Americans in School: A History of Educational Neglect*, which has been offered and admitted into evidence. The court found Dr. Carter to be a very credible witness, eminently well qualified to testify upon the issues raised in this lawsuit relating to whether or not the Mexican-Americans are, and have been historically, discriminated against and segregated in society generally and its schools, and if so, what benefits, if any, can be achieved by integrating the Mexican-American with the district's dominant culture.

Dr. Carter testified during the trial of this case that there exists a history of discrimination against Mexican-Americans. He stated that "particularly in Texas, it has been established that many laws were discriminatory against Mexican-Americans." Tr. p. 52 He added: "in a number of places in the Southwest, in the past, certain facilities—in the past, and I'm speaking of now—were not open to Mexican-Americans. There are such signs as 'Mexicans and Niggers Stay Out'. And also, 'Mexicans and Dogs not Allowed in Restaurants, Barber Shops', so forth. Clear indication in the past of discrimination against Mexican-Americans because of their race or their ethnic group.

This blatant form of discrimination is rapidly disappearing. We are moving into a period of very subtle kinds of discrimination. If you go to the Fair Employment Opportunity Commission and look at the records [there are,] [y]ou will find that the Equal Employment Opportunity Commission hearings are of job discrimination against the Mexican-American. There are remnants of this discrimination still around. If you look at the school situation, obviously there is some kind of discrimination there in many, many ways. I am not speaking of Corpus Christi, I'm speaking generally here.

You get another factor that is called institutional racism where the mechanism that an employer uses inadvertently or blatantly discriminates against the Mexican-American or any other minority. These are any number of items. On testing, for example, Civil Service is perhaps one of the most to be blamed for still maintaining some of these tests that preclude advancement or selection for minorities, and particularly from Mexican-Americans because of a language difference."

39. The evidence shows that Dr. Hector Garcia, a long-time resident of Corpus Christi, Texas, engaged there in the general practice of medicine since about 1946, has been deeply involved in the problems of the community, and especially in the problems of the Mexican-Americans in the area. Dr. Garcia testified that in addition to having served as an alternate delegate with the rank of Ambassador at the United Nations in New York on behalf of the United States of America,

he has served as a Commission Member of the United States Commission on Civil Rights, he has been a member of the Bishop's Committee for the Spanish People (formed by area Regional Bishops of the Catholic Church to seek solutions to the problems affecting Spanish speaking people in the area), he founded the American GI Forum (which is concerned primarily with the problems of Mexican-Americans), and has participated in numerous other committees and meetings concerned with the specific problems of the Mexican-American at all levels in Corpus Christi and throughout the state. The court was most impressed with the sincerity of this witness and, of course, he possesses impeccable qualifications for testifying on the question of whether the Mexican-Americans have been historically discriminated against.

Dr. Garcia testified that Mexican-Americans have always been treated, and are being treated, as a separate group or classification apart from other whites or Caucasions in Corpus Christi and in the surrounding area.

He stated that although Mexican-Americans have held public offices in Corpus Christi, "never by any stretch of the imagination [have they done so] in proportion to their representation, either as scholastic students or by inhabitants in this area." Tr. p. 351. He stated that there has never been a Mexican-American Mayor in Corpus Christi, and that prior to the late 50's or early 60's when Mr. Manuel Maldonado was elected as a City Councilman, there had never been any Mexican-Americans elected to the City Council. In this connection, he stated:

We tried real hard, but we could never achieve success. We were batted down. We were just held down by massive resistance from the controlling factor.

He stated that, except from about 1950 to 1960 when there were two, there has never been more than one Mexican-American on the Corpus Christi Independent School Board.

He further stated that Mexican-Americans were classified separately by the Corpus Christi Police Department and the Department of Public Safety in the area until the latter or middle part of the 1960's—that on traffic summons where a space was provided for race it would be noted whether the person was Latin-American or Mexican. He stated that it has been the practice of the Department of Public Welfare to classify Spanish-surnamed persons as Latins.

Dr. Garcia gave the following testimony with respect to past practices at Memorial Hospital in Corpus Christi, Texas:

Q. Doctor, you are a medical doctor. I will ask you if there has ever been in Corpus Christi any distinction made as far as Mexican Americans are concerned as betwen Mexican Americans and Anglos in either hospital records, health records, or in the treatment of people of Mexican decent in the hospitals in Corpus Christi?

A. Definitely there has been. There was always a separate division or classification of the Mexican American and the rest of the patients at the Memorial Hospital, which is the City-County Hospital, and until as late, I would say, as the latter part of '67 or the beginning of 1968. We are classified and treated as a separate class or group. We were divided. The records indicated it and some birth certificates have indicated it.

I have had some beginning in '48, '49 and '50—I have some bad experiences involving some serious separation or denial of beds to Mexican American patients because although there were beds available at that time in the so-called Anglo wards, because the Mexican ward would have been filled up, these patients were placed out in the hallway and this was to me a terrible experience.

In 1949 I brought it to the attention of the fact you have an empty bed in the so-called Anglo ward. Then of course the policy was simply that they were not going to put no Mexicans with the Anglos. Then of course it persisted, the division in records and classifications on admissions were always white for the Anglos and, of course, Mexican Americans or Latins for the Mexican Americans.

As early as 1965 a memorandum was circulated there by the administrator of Memorial Hospital that no Spanish shall be spoken unless it directly involved whoever was speaking. This I brought before the Board of Directors of the hospital.

We constantly brought this thing up, but of course, the most shocking experience was the fact that at that time when I came out of the service, which I had served also as a doctor, that I come and face this thing in a hospital in Corpus Christi.

I have here some statements as early as '58 wherein the Spanish surname persons—and this was involving a child seven months old, was classified as a Mexican and all the way up through,

as I say, in 1959, the same thing, until the latter part of '67 or '68.

I notice here in the records again where the Anglo patient was classified as race, white, and we have here some emergency room slips that more or less would show the same thing.

Q. Doctor, let me ask you this: You did mention at one time there were actually separate facilities in the Memorial Hospital, which was a County facility, for Mexicans and Anglos.

A. In 1946 on up when I started practicing here in Corpus Christi, Memorial Hospital had separate wards, surgical and maternity. I can't recall pediatrics. But certainly the maternity sections were divided.

When asked if he knew whether or not there was a general practice in the City of Corpus Christi to a large extent to restrict Mexican-Americans from living in particular areas, Dr. Garcia testified as follows:

I would say that very certainly the restrictions that have been put in black and white, the written words, does not carry the whole intent and purposes of trying to discourage and prevent Mexicans and other minority group members from living in the area. It is also the spoken word, the attitude. I had a very good friend of mine who in 1964, a schoolteacher, was denied by all kinds of methods and means and ways of trying to buy a home in the Glen Arbor Subdivision at that time, and we had excuses that at first the FHA would not accept a loan from a Mexican American in that division or subdivision.

We had affidavits here that even a woman who was part Mexican who is married to an Anglo man who is a total Anglo would be refused houses.

We went into the real estate, we went into the housing, we went into cafes, we went everywhere, but the fact the restrictions, they were there, because where the word "Caucasian" was spelled out in writing, it did not include us.

Then later on, even if it were not put into effect by the fact they couldn't pass the examination or the payments or the FHA would object to them, some neighbors also called them—"Don't you know those people are Mexicans?"

It was the general intent and purpose that Mexicans would not be permitted to live in the more exclusive districts at that time, in early 1964, to move in those areas.

He further stated that through the years he has received numerous complaints from various poeple who have been prevented from not only buying homes, but even from renting homes in particular areas of Corpus Christi because they were Mexican-American. He also testified that the Corpus Christi Independent School District has historically hired a disproportionate number of Anglo-American principals, teachers, and other employees. See, footnote 57, *infra*, for the numbers of such employees in 1965–1966 in various capacities, as indicated by plaintiffs' Exhibit 21, which was prepared by Dr. Garcia and about which he testified during the trial.

40. Mr. Apoloneo Montemayor, a Mexican-American who has resided in Corpus Christi since 1924 with the exception of the period during W.W. II, testified as to how he and other Mexican-Americans have been discriminated against in Corpus Christi during his life-time. He stated that when he was in grade school that, although he lived on 10th and Mary Street, he had to walk past George Evans School, an all Anglo-American school, to Cheston Heathe School, a Mexican-American school. He stated that at that time, other than the inconvenience of having to walk farther, he did not realize as he did when he grew up that the fact that he could not go to school with his neighbors would be a difference which would always be there. Mr. Montemayor also related that when he went to work for the American Smelting & Refining Corporation in 1941, Mexican-Americans were only hired as laborers in the production department and were excluded from employment with the maintenance, electrical, crafts and power house departments where only Anglo-Americans were employed. He stated that this practice continued until 1953. But now, he stated, 65% of the 1st class jobs in maintenance are filled by Mexicans and the number of blacks has been increased. He also testified that the Mexican-Americans used to be severely segregated, residentially:

Back when I lived on 10th Street & Staples, Agnes, Mary Street, and South —that is where the Anglos lived—Mary Street North is where the Mexicanos live. Marion Staples Northwest was for the Mexicanos and no Mexicanos lived otherwise.

Tr. p. 211–12. He stated that there has always been strong resistence to any attempt on the part of a Mexican-American to buy homes in Anglo-American neighborhoods. He further testified that the Mexican-Americans in Corpus Christi have been substantially excluded from organizations such as the Rotary Club and the Chamber of Commerce. Finally, Mr. Montemayor testified that MAYO (Mexi-

find that Mexican-Americans have been discriminated against as a class, I further find that because they are an identifiable, ethnic minority [41] they are more susceptible to discrimination and this is not common to Mexican-Americans and Negroes alone, but it appears from history that any identifiable, minority [42] group (that is, different persons, whether it be racial ethnic, religious, or national origin) may quite often suffer from this problem. It seems to this court that the Mexican-American organizations, such as LULAC and the G.I. Forum, and now MAYO, were called into being in response to this problem. [43] This is why, perhaps, we are having so many studies, so many hearings, so many government commis-

sions studying these problems, [44] and so many publications and books being published concerning this very real problem. [45] Fortunately, the objective manifestations of this type of discrimination are gradually disappearing from our society. Nevertheless, this historical pattern of discrimination has contributed to the present substantial segregation of Mexican-Americans in our schools. This segregation has resulted in a dual school system.

The court also finds that the Negro students in the Corpus Christi Independent School District are also segregated to a degree prohibited by law which causes this to be a dual rather than a unitary school system. [46]

can-American Youth Organization) was formed to lessen the discriminatory treatment the young Mexican-Americans are receiving in jobs and education.

41. See footnote 27, *supra.*

42. *Id.*

43. The young Mexican-Americans have recently begun to call themselves Chicanoes, and their movement, La Roza. During the pendency of this suit, these Chicanoes have been trying to get La Roza on the Texas ballot as La Roza Unida Party.

44. See footnote 34, *supra.*

45. See the bibliography to *Mexican-Americans in School: A History of Educational Neglect,* by Dr. Thomas Carter (College Entrance Examination Board, New York: 1970).

46. Defendants' Exhibit 4, reproduced in footnote 36, *supra,* indicates that during the 1969–70 school year, approximately 5.73% of the elementary students, 5.25% of the junior high students, and 4.66% of the senior high students were Negro. As the court mentioned in footnote 37, *supra,* 50.78% of the elementary students, 46.71% of the junior high students, and 38.87% of the high school students were Mexican-American during the 1969–70 school year. Thus, if the district's Negro and Mexican-American students had been uniformly integrated with the Anglo-American student population, each elementary school would have had approximately 43% Anglo-American students in each elementary school, 48%, in each junior high school and 56% in

senior high school. Few schools had enrollments anything close to these figures. Most of the district's Negro students attended schools that were all black, or overwhelmingly Mexican-American. Defendants' Exhibit 4 in footnote 40, showing the percentage of Negro students enrolled in each school in 1969–1970, indicates the following:

1. As to elementary students:

a. 825 of the 1,398 Negro elementary students in the district attended either Crosley or Washington elementary school. Thus, approximately 60% of the Negro elementary children in the district were concentrated in only 2 of the district's 45 elementary schools;

b. Washington elementary school had a 100% Negro enrollment;

c. 473 other Negro elementary children attended Allen, Crockett, Evans, Furman, Garcia, Lamar, Los Encinas, Lozano, Prescott, Shaw, Southgate and Travis, and in each of these schools the Mexican-American enrollment ranged from 70% to in excess of 90% of the total enrollment.

d. In Calk, Fisher, Fraser, Gibson, Meadowbrook, Montclair, Parkdale, Sanders, Schanen, Smith, Wilson, Windsor Park, Woodlawn and Yeager elementary schools, the percentage of Anglo-American children exceeded 70% of each school's total enrollment.

2. As to the 12 junior high schools, the percentage of Negro and Mexican-American students enrolled in Barnes, Cunningham and Wynn Seal exceeded 75% of each school's total enrollment. And in Baker, Brown, Cullen, Haas, Hamlin and Sundeed junior high schools, the percentage of Anglo-American stu-

The court's finding that the Mexican-American and Negro students are substantially segregated from the remaining student population of this district is based primarily upon the undisputed statistical evidence. This is also, and I so find, true of the faculty.[47]

█ The court is of the opinion that by placing Negroes and Mexican-Americans in the same school does not achieve a unitary system as contemplated by law. A unitary school district can be achieved here only by substantial integration of the Negroes and Mexican-

Americans with the remaining student population of the district.[48]

As to whether or not the desegregation which has resulted in this dual system is de facto or de jure, the court is of the opinion that some of the segregation was of a de facto nature because of the socio-economic factors which caused Negroes and Mexican-Americans to live in the "corridor" (which we have described here as where they live, and which is similar to the ghettos of other cities), and because of the pattern of the geographic and demographic expansion of the city towards the south and southwest.[49]

dents exceeded 75% of each school's total enrollment. Nine of the twelve junior high schools are readily identifiable as a segregated Anglo-American or non-Anglo-American school.

3. Each of the senior high schools had enrolled either 75% or more Anglo-American students or 75% or more non-Anglo-Americans. Each was readily identifiable as either a segregated Anglo-American school or non-Anglo-American school.

It is manifestly clear from the evidence that the Negro students within the Corpus Christi Independent School District have historically been substantially segregated in the schools from the district's Anglo-American students.

The court's statement in text that the ethnic imbalance in the district's schools constitutes constitutionally impermissible segregation as to the Negro students attending the district's schools is not based solely on the fact that such segregation exists, but also upon additional considerations relating to the causes of such condition, all of which are set forth in text and accompanying footnotes following the

textual statement to which this footnote relates.

47. See footnote 56 and accompanying text, *infra.*

48. The constitutional inquiry is concerned with whether a particular disadvantaged group is being substantially segregated from the more advantaged group; the constitutional ill is not cured simply by comingling two similarly disadvantaged groups (the Negroes and the Mexican-Americans), both of which are substantially segregated from the more advantaged group, which in this case is the Anglo-American population. See generally, footnote 27, *supra.*

49. The Corpus Christi Independent School District, encompassing most of the City of Corpus Christi, Texas, is of an elongated, crescent shape, as it has followed the city's expansion to the South and Southeast along the curvature of Corpus Christi Bay. The hatch marks on the map reproduced here indicate the general size, location and configuration of the district.

■ But this segregated and dual school district has its real roots in the minds of men; that is, the failure of the school system to anticipate and correct the imbalancing that was developing. The court is of the firm opinion that administrative decisions by the school board in drawing boundaries,[50] locating

CORPUS CHRISTI INDEPENDENT SCHOOL DISTRICT

The district's Negro and Mexican-American population is highly concentrated within a fairly narrow band located in what is generally the middle part of the district where its width narrows. This Negro and Mexican-American "corridor", as it has been referred to during the trial of this case, runs from the Northeast corner of the district in a generally South-westerly direction across the district, as indicated, and varies in width, where the Negro and Mexican-American density is very high, from about one to three miles. The relative number of Negro and Mexican-Americans, as opposed to Anglo-Americans, in neighborhoods to the South and Southeast of this "corridor" quite rapidly and very dismatically decreases the farther to the South or Southeast from the "corridor" the neighborhood is located. Relatively few Negroes and Mexican-Americans reside in the more affluent South and Southeast parts of the district. These areas are predominantly Anglo-American. Thus, residentially, the district is imbalanced with respect to its Anglo-American, Mexican-American, and Negro residents.

The school district's authorities have followed a neighborhood school policy under which students have been, and are, assigned to schools near their homes by use of geographic attendance zone lines. This superimposing a neighborhood school plan in this district which has such a marked pattern of residential segregation, has, inevitably, resulted in the Negro and Mexican-American also being substantially segregated in the schools. See footnotes 37 and 46, supra.

50. There is one especially noticeable example. Plaintiffs' Exhibit 32, a map of Corpus Christi, shows the existing senior high school boundaries as they existed in 1967 together with the new boundary lines which were effective upon the opening of Moody High School. The exhibit shows that students residing in the corridor were divided between Carroll, Miller and Ray prior to the establishment of Moody. The boundary lines as established by the school board walled in Negro and Mexican-American children in the Moody High

new schools, building new schools and renovating old schools in the pre-

School zone and withdrew significant numbers of both groups from Carroll, Ray and Miller. These boundaries diminished the degree of integration of these Negro and Mexican-American children with Anglo-American children which existed prior to this time.

Before 1961, the district's Washington and Hirsch elementary schools served the same geographic area, near the Northeast corner of the district. The limited freedom of choice policy allowed Negro students in the area to attend Hirsch. When Hirsch was closed in 1961, the boundary lines were drawn in such a way that Anglo and Mexican-American children who formerly attended Hirsch were assigned to Beach Elementary school, which was much farther from their homes than Washington. This action caused Washington to become more segregated.

Defendants' Exhibit 2 (see footnote 14, supra), shows that the boundaries for the

dominantly Negro and Mexican parts of town,[51] in providing an elastic and

newly constructed Sterling Martin, Jr. High School do not cross Ayers Street on the South. The effect of this boundary limitation increases the segregation of the Negro and Mexican-American students for the evidence has shown Ayers Street to be a "quasi-border" on the southern side of the "corridor," there being a much higher percentage of Anglo-Americans residing to the South of Ayers than to the North.

The evidence very clearly shows that the school board, in establishing, altering or changing school boundaries never considered promotion of integration as between the Negroes and Mexican-Americans with the Anglo-Americans as a factor in such boundary establishment or change.

51. The following is a list of the schools the district built since 1960, along with the approximate percentage of each ethnic group's student enrollment in 1969–1970:

| School | Negro | Mex.-Amer. | Anglo-Amer. |
|---|---|---|---|
| King Sr. H. | .24 | 9.23 | 90.53 |
| Moody Sr. H. | 10.57 | 85.78 | 3.65 |
| Cullen Place Jr. H. | –0– | 6.18 | 93.82 |
| Tom Browne Jr. H. | –0– | 8.68 | 91.32 |
| Haas Jr. H. | –0– | 10.99 | 88.66 |
| Martin Jr. H.* | | | |
| Garcia Elem. | 27.81 | 72.19 | –0– |
| Los Encinas Elem. | 12.46 | 74.47 | 13.07 |
| Meadow Brook Elem. | –0– | 8.46 | 91.37 |
| Schannen Est. Elem. | –0– | 3.28 | 96.55 |
| Smith elem. | 1.03 | 12.66 | 86.31 |
| Yeager elem. | –0– | 6.70 | 93.30 |

* Since this school was not scheduled to open until the Fall of 1970, no enrollment figures were available. However, the school site lies in an area with a very high concentration of Mexican-Americans.

---

As the figures reflect, the Negro and Mexican-American students either represent a very high or a very low percentage of the total enrollment in each of the schools listed above. The schools are ex-

tremely imbalanced, ethnically.

The following schools have had major renovations and/or additions made since 1960. The percentage of each ethnic group's 1969–70 enrollment is also listed:

| School | Negro % | M-Amer. % | Anglo-Amer. % |
|---|---|---|---|
| Miller H. | 13.70 | 65.61 | 20.69 |
| Solomon Coles Jr. H. | 36.95 | 57.97 | 5.08 |
| Wynn Seale Jr. H. | .75 | 92.07 | 7.18 |
| Crockett Elem. | 6.39 | 90.69 | 2.92 |
| Evans Elem. | 6.48 | 93.06 | 0.46 |
| Kostoryz Elem. | –0– | 36.14 | 63.59 |

flexible subjective, transfer system that resulted in some Anglo children being allowed to avoid the ghetto, or "corridor" schools,[52] by bussing some students,[53] by providing one or more optional transfer zones which resulted in Anglos being able to avoid Negro and Mexican-American schools, not allowing Mexican-Americans or Negroes the option of going to Anglo schools,[54] by spending extraordinarily large sums of money which resulted in intensifying and perpetuating a segregated, dual school system,[55] by assigning Negro and Mexican-American teachers in disparate ratios to these segregated schools,[56] and

With the exception of Kostoryz Elementary School, the above figures show that the combined percentages of enrollment of the Negro and Mexican-American students represent a disproportionately high or low percent of the total enrollment in each school.

Promoting integration of the Negro and Mexican-American students with the Anglo-American students clearly was not considered by the district's school board as a factor in its decisions as to where new schools were to be located, the size the new schools should be, or whether old schools should be renovated or enlarged. The district did not consider, and consequently did not pursue, viable alternate locations for schools which, even using a form of neighborhood school plan, would have resulted in a much more favorable ethnic and racial balance.

52. Plaintiffs' Exhibits 26(1) and 26(106) consist of some 200 or so "Student Emergency Transfer Applications" that have been submitted on behalf of students in the district. Each application has a short statement and the reason for transfer and an indication of the action taken by the school authorities. These exhibits show that the district's treatment of such applications has been sufficiently elastic to allow Anglo-American students to escape corridor schools. For example, it has been far more difficult for Mexican-American children to transfer from schools with high percentage of Negroes and Mexican-Americans enrolled to schools with low percentages of Negroes and Mexican-Americans than it has been for Anglo-American children. The exhibits also show that it has been easier for Mexican-American children to transfer to schools with higher percentages of Negroes and Mexican-Americans than to transfer to schools with lower percentages of Negroes and Mexican-Americans. The obvious effect has been to diminish whatever integrative effect the district's attendant zones would have otherwise achieved.

53. For example, when the district closed Hirsch Elementary School in 1961, the boundary lines were drawn so that Anglo and Mexican-American children who formerly attended Hirsch were assigned to Beach Elementary, which was much farther from their homes than Washington. These children had to be bussed on a freeway over the Navigation Channel to reach Beach Elementary School. This action caused the enrollment of Washington Elementary to be almost entirely Negro.

54. The district established an option zone to the southern portion of the Menger zone, granting Junior high school students residing within this area the option of attending either Wynn Seale Junior High School, which has an overwhelmingly large percentage of Mexican-American students, or Baker Junior High School, which has only a small Mexican-American Negro enrollment. The students residing within the option zone are predominantly Anglo-Americans. Although the purpose for establishing this option zone was to utilize idle capacity at Baker, the option was never granted to other areas, just as close to Baker as the optional zone selected, but which had, unlike the population of the option zone selected, high densities of Mexican-American junior high school students. Obviously the promotion of integration of the Negro and Mexican-American students with the Anglo-American students was not considered by the school board in the establishment and selection of the optional transfer zone.

55. Plaintiffs' exhibits 11 and 13 show that rather than build new schools in locations which would encompass areas more racially and ethnically balanced, large sums of money were expended in enlarging facilities at existing sites located in the midst of highly segregated neighborhoods. See footnote 51, *supra*. This is also shown by plaintiffs' Exhibit 36 (described in footnote 12, *supra*). The board did not consider the promotion of integration of the Negroes and Mexican-Americans with the Anglo-Americans in the construction of school facilities.

56. See defendants' Exhibit 4, reproduced in footnote 37, *supra*, and compare in this exhibit the number of Negro and Mexican-American teachers assigned in the 1969–70 school year to the schools where the percentage of Negro and Mexican-Ameri-

further failing to employ a sufficient number of Negro and Mexican-American school teachers,[57] and failing to provide a majority-to-minority transfer rule, were, regardless of all explanations and regardless of all expressions of good in-

can student enrollment is disproportionately high with the number of such teachers where the percentage of Negro and Mexican-American student enrollment is disproportionately low. Plaintiffs' Exhibit 17 shows the same pattern as to Negro teacher assignments for years 1960 through 1968. Plaintiffs' Exhibit 3–B and defendants' Exhibit 5 show that this pattern existed in 1968–69 as to both Negro and Mexican-American teachers. Promoting integration of the schools— through the assignment of teachers of each group (Negro, Mexican-American and

tentions, calculated to, and did, maintain and promote a dual school system. Therefore this court finds as a matter of fact and law that the Corpus Christi Independent School District is a de jure segregated school system.[58]

Anglo-American) to each school in the district so that the relative percent of each group assigned to each school would reflect the district's cumulative percentages—was not a consideration in the school board's assignment of teachers.

57. Page 2 of the defendants' Exhibit 9 (described in footnote 22, *supra*) shows that the number and percent of the total number of Anglo-American, Negro and Mexican-American teachers employed in 1955–56, 1965–66 and 1969–70, were as follows:

| Teachers | 1955–56 | | 1965–66 | | 1969–70 | |
|---|---|---|---|---|---|---|
| Anglo-American | 1,037 | 90.6% | 1,527 | 86.1% | 1,519 | 79.6% |
| Mexican-American | 56 | 4.9% | 201 | 11.3% | 330 | 17.3% |
| Negro | 52 | 4.5% | 46 | 2.6% | 60 | 3.1% |
| Total | 1,145 | | 1,774 | | 1,909 | |

See also, defendants' Exhibit 4, reproduced in footnote 37, *supra*.

The district has also historically hired a disproportionately small number of Negro and Mexican-American professional personnel, for positions on the Central Staff, as principals, counselors and other specialists, other than regular classroom teachers. Defendants' Exhibit 9 shows that in the school year 1955–1956 there was only 1 Mexican-American, 5 Negroes so employed, as opposed to 115 Anglo-Americans so employed. The exhibit shows that for school year 1969–1970, the district had so employed 38 Mexican-Americans, 4 Negroes, and 223 Anglo-Americans.

Plaintiffs' Exhibit 21, containing statistics concerning the number of Mexican-Americans employed by the district in various capacities during the 1965–1966 school year, shows the following for that year:

1. There were no Mexican-Americans employed in top administrative positions;

2. No Mexican-Americans were employed as head of assistants, divisions of personnel, research or pupil services;

3. Only 2 Mexican-Americans were employed as consultants out of a total of 14;

4. Only one Mexican-American nurse was employed out of 15 school nurses;

5. Out of 55 school cafeteria managers, only 5 Mexican-Americans were employed;

6. No Mexican-Americans were employed out of 36 high school administrative officers;

7. Only 4 American-Americans were employed out of a total of 52 junior high school administrative officers; and

8. Only 3 Mexican-American principals were employed out of a total of 39 elementary school principals.

58. Wholly so with respect to the district's Mexican-Americans and predominantly so with respect to the district's Negroes, the de jure nature of the existing pattern of segregation within the Corpus Christi Independent School District has as its basis state action of a non-statutory variety— that is, the school board's active pursuit of policies that not only do nothing to counteract the effects of existing patterns of residential segregation in view of viable alternatives of significant integrative value, but, in fact, increase and exacerbate the district's racial and ethnic imbalance. There has been a history of official school board acts which have had such a segregative effect. See footnotes 50 through 57 and accompanying text, *supra*. The educational values of the school board's policies do not outweigh the integrative

value of policies it either ignored or rejected. Absent such justification, the imbalance cannot withstand constitutional scrutiny under the Fourteenth Amendment's equal educational opportunity guarantee.

The quality or quantum of segregative acts sufficient to satisfy the requirements of state action of the sort condemned by Brown v. Bd. of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and subsequent cases, are of course indeterminate. Many courts have held that the requisite state action is absent when a board merely fails to correct imbalance. E. g., Bell v. School City, 213 F.Supp. 819 (N.D.Ind.), affirmed, 324 F.2d 209 (7th Cir. 1963), cert. den., 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1964). This line of cases does not require a school board to alter a neighborhood school attendance plan to counteract true de facto segregation. See, e. g., Moses v. Washington Parish Sch. Bd., 276 F.Supp. 834, 840 (E.D.La.1967). Because the Supreme Court has not ruled otherwise, the Supreme Court's narrow holding in *Brown* has often been an insurmountable barrier to those seeking judicial relief from segregation resulting from the superimposition of a neighborhood school plan upon a pattern of residential segregation. E. g., Swann v. Charlotte-Mecklenburg Bd. of Education, 369 F.2d 29 (4th Cir. (1966); Webb v. Bd. of Education of Chicago, 223 F.Supp. 466 (N.D.Ill.1963). Yet school boards, in the exercise of their administrative discretion in determining school sites, school sizes and capacities, the location of attendance zone lines, etc., can, and often do, have an overwhelming impact upon the degree of racial and ethnic mixing that is achieved in the schools. Recognizing the pervasive influence that school boards can have in this area, other courts have broadened the concept of "unlawfully segregative state action" to include the improper exercise by a school board (as agent of the State and of its political subdivisions) of its administrative discretion in connection with the implementation, operation or manipulation of a neighborhood school plan. When such "state action" creates or perpetuates racial or ethnic imbalance, it may be in violation of equal protection.

In Taylor v. Bd. of Educ. of New Rochelle, 191 F.Supp. 181 (S.D.N.Y.), reh., 195 F.Supp. 231, aff'd 294 F.2d 36 (2d Cir.), cert. den. 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), the court, declaring that de jure segregation should include all "segregation created or maintained by official act, regardless of its form" (191 F.Supp. at 194, n. 12), found the segregation in question to be of a de jure nature because (1) the board had gerrymandered attendance zones which effectively segregated the schools, and (2) the board, ignoring the advice of psychologists, sociologists, educators and state officials had made no changes to improve the balance in the schools. This case suggests that de facto segregation may take on overtones of de jure segregation not only when a school board causes segregation by intentional, affirmative acts, but also when it fails to adopt viable alternatives of integrative value. See also, Keyes v. School Dist. of Denver, *supra* note 31.

The case of Hobson v. Hansen, 269 F. Supp. 401 (D.D.C.1967), aff'd, Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F. 2d 175 (1969), involved a neighborhood school plan in the District of Columbia which predictably had resulted in severe imbalance in the schools there. The court ruled that segregation created by such a plan must be supported by "compelling or adequate justification." 269 F.Supp. at 508. The court found that the administrative and cost considerations urged in that case were not sufficient justification in view of the comparative value of integration.

One line of cases has followed a theory that a school board, aware of residential patterns of segregation within its district, assumes the discriminatory posture of homeowners by locating schools in the middle of, and drawing neighborhood school attendance lines around segregated neighborhoods. See, e. g., Brewer v. School Bd. of Norfolk, 397 F.2d 37 (4th Cir. 1968); United States by Clark v. Bertie County Bd. of Educ., 293 F.Supp. 1276 (E.D.N.C.) (requiring the board to redraw attendance zones in such a manner as to counteract the effects of residential segregation); Barksdale v. Springfield School Commission, 237 F. Supp. 543 (D.Mass.), vacated on other grounds, 348 F.2d 261 (1st Cir. 1965); Blocker v. Bd. of Education of Manhasset, 226 F.Supp. 208 (E.D.N.Y.1964).

Whatever rationale is adopted, there very clearly exists a trend away from the position that mere failure to correct imbalance does not constitute state action. The fact that a school board has not pursued, as in this case, more effective measures, reasonable in terms of cost and administrative considerations, is probably enough to cause imbalances thus created to be de jure in contravention of the *Brown* rationale. But certainly where, as here, a neighborhood school plan has

The defendants have attempted to show that the Negroes and Mexican-Americans are spread throughout the city. To whatever extent this is true, nevertheless, the undisputed statistics show that the Negroes and Mexican-Americans are substantially segregated in the school system.[59] So this would mean that the schoolhouses are more segregated than the neighborhoods.

The defendants argued that they did not have the benefit of hindsight, which we all appreciate, but this court feels that there were sufficient warnings given to the school board by interested citizens and groups to alert them to this problem, which any school board member or superintendent should know might be a problem in this day and age.[60]

been implemented and operated in such a way as to increase the imbalances, a program of de jure segregation exists.

59. See, defendants' Exhibit 4, reproduced in footnote 38, *supra*.

60. Dr. Garcia testified that beginning in the latter part of 1948 and 1949 and periodically thereafter, he and others have met with the superintendents of the district to object to the fact that the district had a disproportionately low number of Mexican-American principals and teachers and to urge that the district take action to correct this imbalance in the faculty and staff. Dr. Garcia presented a paper (plaintiffs' Exhibit 21, summarized in footnote 50, *supra*) at a hearing on the Texas Advisory Committee of the United States Commission on Civil Rights during which he stated the number of Mexican-American teachers, principals, administrative and other staff personnel, etc., employed by the district in school year 1965–66 in comparison to the total number of teachers, etc., employed at that time.

In a letter dated August 18, 1967 to the Chairman of the Board of Trustees of the Corpus Christi Independent School District from the Chairman of the Human Relations Committee of. the City of Corpus Christi (plaintiffs' Exhibit 37), the school board chairman was urged to immediately consider establishing better communications between the school administration, school board and the communities to be served in order to deal more effectively with, and not continue to ignore, race and ethnic problems, and to consider changing boundaries of various schools in order to achieve a better mix between the Mexican-American and Negro students with the Anglo-American students.

Plaintiffs' Exhibit 37–A, entitled "Report of the Special Sub-Committee of the Human Relations Committee Investigating Charges of De Facto Segregation at Moody High School and a Myriad of Complaints in Reference to Cunningham and Prescott Schools," and dated August 16, 1967, summarizes the committee's questions presented to the district's administration concerning, among other matters, the possibility of taking various actions (e. g., redraw boundary lines) to alleviate the existing patterns of segregation of the Negro and Mexican-American students from the Anglo-American students. A summary of the school administrations answers are also stated in the report. Plaintiffs' Exhibit 37 indicates that a copy of the report was sent to the Chairman of the Board of Trustees of the district on August 18, 1967.

In plaintiffs' Exhibit 38, a letter to the president of the school board from the president of the NAACP, dated March 27, 1968, a complaint was made concerning certain segregative practices, including gerrymandering attendance areas, and requested that the matters be discussed at the earliest possible date.

The chairman of the Human Relations Committee wrote the district's superintendent on May 14, 1968 (plaintiffs' Exhibit 39), again asking that action be taken to end discriminatory practices in the district's schools.

A letter dated October 21, 1968, to the superintendent of the district from the Education Branch Chief, Office for Civil Rights, Department of Health, Education and Welfare (plaintiffs' Exhibit 31), advised the superintendent that 83% of the Mexican-American and Negro children in the district were attending identifiable minority group schools and suggested that to help to cure this problem the school board should redraw boundary lines and adopt a "majority-to-minority" transfer rule. The letter also stated that while the district had made progress toward eliminating discriminatory practices in hiring and assigning faculty and administrative personnel, this process had not been completed. The letter also stated that school sites had been selected with the effect of perpetuating identifiable minority group schools (giving examples), boundary lines had been drawn

This court is not here to place blame, criticize, or find fault, but this suit was brought to this court by the plaintiffs alleging a denial of rights protected by the Fourteenth Amendment, and it is this court's duty to adjudicate these grievances. The courts do not go out and look for these controversial problems to solve; they are brought to the court-house by human beings with a grievance, and that is where they should be brought.

This court knows that Board members change from time to time; this court knows that in our complex society of today of large institutions that we do have problems of personal responsibility or of collective responsibility, individual fault or corporate fault, private blame or institutional blame. The problem of moral man and immoral society, as Niebuhr puts it,[61] is still with us. But whatever were the personal and in-dividual intentions of the school board members, who I noted did not testify in this case, the board had the ultimate re-sponsibility,[62] and I find that the board of trustees of the Corpus Christi In-dependent School District has not dis-charged its heavy burden[63] to explain its preference for what this court finds is a segregated and dual school system. I cannot and do not accept the explana-tions given by the school administration for not only maintaining a segregated school system and dual school system, but really what appears to me to be a program which will intensify and

magnify the problem as time goes on. This court is of the opinion that there are reasonable available methods to effect a unitary system, and this court finds that this dual system can be dis-established without significant adminis-trative, educational, economic, or trans-portation costs. And I appreciated the plaintiffs bringing to the court's at-tention that they are not here asking for a large number of children to be bussed, and neither is the court.

■ It is obvious that the faculty and the administrative staff are even more segregated than the schools.[64] There is no real dispute here. The school must assign Negroes and Mexican-American teachers throughout the system on the same ratio of percentages they are in the total teacher and staff population.[65] Furthermore, the school board must immediately take steps to employ more Negro and Mexican-American teachers.

■ And as to the dire effects the defendants claim will result if there is more transportation of students than is presently done, the courts says that the children who are being bussed now make no such claims, nor have I been shown any harmful effects on the individual children that will outweigh the harmful effects on the Negro or Mexican-American child who is in a segregated and dual system. That is my opinion after giving careful atten-

with the effect of perpetuating minority group schools (giving examples), and that schools in Mexican-American areas were more crowded than schools in Anglo areas, and more schools in the Mexican-Ameri-can areas were utilizing portable class-rooms (giving specific examples) all of which, the letter states, had the effect of segregating the Mexican-American stu-dents. In summary, the letter concluded that the school board had been much more responsive to the needs and desires of the Anglo community than to those of the Mexican-American and Negro residents.

61. *Moral Man and Immoral Society* by Reinhold Neibuhr (Charles Scribner's Sons: New York, 1960).

62. Green v. County School Bd. of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Andrews v. Monroe, 425 F.2d 1017 (5th Cir., April 23, 1970); Singleton v. Jackson Munici-pal Separate School Dist., 419 F.2d 1211 (5th Cir. 1970); Henry v. Clarksdale Mun. Separate School Dist., 409 F.2d 682 (5th Cir., March 6, 1969).

63. *Id.*

64. See footnote 56, *supra*.

65. Ellis v. Bd. of Public Instruction of Orange County, 423 F.2d 203 (5th Cir. 1970); Singleton v. Jackson Mun. Sepa-rate School Dist., 419 F.2d 1211, 1218 (5th Cir. 1969).

tion to all of the testimony of the experts. The physical and social inconveniences that some children might suffer will not be so severe or so prolonged when compared to the psychological and emotional trauma, and scarring, and crippling that minority [66] children

suffer when they feel they are rejected and not accepted.

As to the educational benefits, this court is of the opinion that the Anglo child and the Negro and the Mexican child will benefit by a unitary system, and I think the plaintiffs' statistics [67]

66. See footnote 27, *supra.*

67. Plaintiffs' Exhibit 21 indicates that the median years of school completed by persons in Corpus Christi 25 years of age and over by ethnic groups were the following in 1950:

| Anglo-American | Mexican-American | Negro |
|---|---|---|
| 11.8 years | 3.2 years | 7.7 years |

The same exhibit shows the following respective figures for 1960:

| Anglo-American | Mexican-American | Negro |
|---|---|---|
| 12.2 years | 4.5 years | 8 years. |

Table 1 at pp. 22–23, of plaintiffs' Exhibit 18 (see footnote 68, *infra*), shows the median years of school completed by Mexican-Americans and non-white persons

25 years of age and older in standard metropolitan districts in the five southwestern states as of 1950 and 1960, as follows:

| | 1950 Total Population | WPSS * | 1960 Total Population | Anglo | WPSS | Non-white |
|---|---|---|---|---|---|---|
| ARIZONA | 10.0 | 6.0 | 11.2 | 12.1 | 7.0 | 7.0 |
| Phoenix | 10.6 | 5.3 | 11.6 | 12.1 | 6.1 | 8.5 |
| Tucson | 11.2 | 6.5 | 12.1 | 12.3 | 8.0 | 7.8 |
| CALIFORNIA | 11.6 | 7.8 | 12.1 | 12.2 | 8.6 | 10.6 |
| Bakersfield | 9.9 | 6.5 | 10.8 | 11.4 | 7.3 | 8.5 |
| Fresno | 9.8 | 5.6 | 10.4 | 10.7 | 6.1 | 8.8 |
| Long Beach–Los Angeles | 12.0 | 8.2 | 12.1 | 12.3 | 8.9 | 11.1 |
| Sacramento | 11.3 | 7.9 | 12.2 | 12.3 | 9.1 | 10.9 |
| San Bernardino–Riverside Ontario | 10.9 | 6.7 | 11.8 | 12.1 | 8.0 | 9.8 |
| San Diego | 12.0 | 8.1 | 12.1 | 12.2 | 8.9 | 10.7 |
| San Francisco–Oakland | 12.0 | 8.9 | 12.1 | 12.3 | 9.7 | 10.2 |
| San Jose | 11.4 | 8.1 | 12.2 | 12.4 | 8.3 | 12.0 |
| Santa Barbara | 11.8 | 7.0 | 12.2 | 12.4 | 8.3 | 9.9 |
| Stockton | 9.1 | 7.2 | 10.0 | 10.7 | 7.5 | 8.2 |
| COLORADO | 10.9 | 6.5 | 12.1 | 12.2 | 8.2 | 11.2 |
| Colorado Springs | 11.7 | 8.4 | 12.3 | 12.4 | 10.1 | 12.1 |
| Denver | 12.0 | 8.0 | 12.2 | 12.3 | 8.8 | 11.4 |
| Pueblo | 9.1 | 6.3 | 10.2 | 11.0 | 8.1 | 9.2 |
| NEW MEXICO | 9.3 | 6.1 | 11.2 | 12.2 | 7.4 | 7.1 |
| Albuquerque | 11.7 | 7.7 | 12.1 | 12.5 | 8.7 | 10.9 |
| TEXAS | 9.3 | 3.5 | 10.4 | 11.5 | 4.8 | 8.1 |
| Abilene | 10.1 | —— | 11.7 | 12.0 | 4.0 | 8.8 |
| Amarillo | 11.3 | 4.7 | 12.1 | 12.2 | 8.1 | 9.5 |
| Austin | 10.9 | 3.5 | 11.7 | 12.3 | 4.4 | 8.6 |
| Beaumont-Port Arthur | 9.7 | 7.0 | 10.8 | 11.7 | 8.7 | 7.1 |
| Brownsville–Harlingen–San Benito | 6.3 | 2.7 | 7.9 | 12.3 | 3.9 | 9.5 |
| Corpus Christi | 9.4 | 3.2 | 10.1 | 12.2 | 4.5 | 8.0 |
| Dallas | 11.0 | 4.4 | 11.8 | 12.1 | 6.4 | 8.6 |
| El Paso | 9.2 | 5.2 | 11.1 | 12.4 | 6.6 | 11.7 |
| Fort Worth | 10.7 | 5.4 | 11.4 | 11.9 | 7.7 | 8.7 |
| Galveston | 9.4 | 4.9 | 10.3 | 11.3 | 6.9 | 8.3 |
| Houston | 10.4 | 5.2 | 11.4 | 12.1 | 6.4 | 8.8 |
| Laredo | 5.4 | 5.2 | 6.7 | —— | 5.4 | —— |
| Lubbock | 11.0 | 1.7 | 11.6 | 12.1 | 3.1 | 8.3 |
| Midland | 12.1 | 1.8 | 12.4 | 12.6 | 3.7 | 8.8 |
| Odessa | 10.4 | 3.9 | 11.4 | 11.8 | 4.6 | 8.8 |
| San Angelo | 10.2 | 2.9 | 10.7 | 11.5 | 4.0 | 8.0 |
| San Antonio | 9.1 | 4.5 | 10.0 | 12.1 | 5.7 | 9.4 |
| Waco | 9.4 | 2.9 | 10.3 | 11.0 | 5.5 | 8.2 |
| Wichita Falls | —— | —— | 11.4 | 11.7 | 6.3 | 8.7 |
| ALL FIVE STATES | 10.6 | 5.4 | 11.6 | 12.1 | 7.1 | 9.0 |

(* WPSS means White Person of Spanish Surname)

Table 3, at p. 27 of Plaintiffs' Exhibit 18 (see footnote 68, *infra*), shows estimated school dropout rates by grade level in Texas, expressed in percentage of enrollment by grade, as follows:

| Grade | Anglo | Latin | Negro | Total | Cumulative |
|---|---|---|---|---|---|
| 7 | 4.8 | 17.6 | 7.2 | 9.3 | 9.3 |
| 8 | 7.0 | 17.1 | 8.9 | 10.6 | 19.9 |
| 9 | 15.0 | 22.5 | 19.2 | 18.1 | 38.0 |
| 10 | 28.5 | 23.2 | 26.7 | 26.4 | 64.4 |
| 11 | 27.4 | 13.7 | 23.6 | 22.3 | 86.7 |
| 12 | 17.4 | 5.9 | 14.4 | 13.1 | 99.8 |
| TOTAL | 100.1 | 100.0 | 100.0 | 99.8 | |

and study [68] show this, especially those on the amount of schooling Anglos and

Source: Governor's Committee on Public School Education in Texas (1968, p. 38). Also, defendants' Exhibit 18, reproduced below, shows that the dropout rate in the district is higher for the Mexican-American and Negro students than it is for Anglo-American students.

EXHIBIT 18

CORPUS CHRISTI PUBLIC SCHOOLS

Corpus Christi, Texas

July 30, 1968

DROP-OUT STUDY BY ETHNIC GROUPS 1967–68

| School | Enrollment | STUDENT BODY | | | | | | | Drop-outs | DROP-OUTS | | | | | | | Pct. of Drop-outs |
| | | Ang-Am | | Mex-Am | | Negro | | | | Ang-Am | | Mex-Am | | Negro | | |
| | | No. | Pct. | No. | Pct. | No. | Pct. | | | No. | Pct. | No. | Pct. | No. | Pct. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carroll | 1757 | 1359 | 77.35 | 398 | 22.65 | 0 | 0.00 | 54 | | 40 | 74.07 | 14 | 25.93 | 0 | 0.00 | 3.07 |
| King | 1845 | 1688 | 91.49 | 151 | 8.18 | 6 | 0.33 | 118 | | 109 | 92.37 | 9 | 7.63 | 0 | 0.00 | 6.40 |
| Miller | 2098 | 484 | 23.07 | 1392 | 66.35 | 222 | 10.58 | 200 | | 41 | 20.50 | 136 | 68.00 | 23 | 11.50 | 9.53 |
| Moody | 1459 | 65 | 4.46 | 1270 | 87.04 | 124 | 8.50 | 75 | | 7 | 9.33 | 63 | 84.00 | 5 | 6.67 | 5.14 |
| Ray | 2074 | 1489 | 71.79 | 583 | 28.11 | 2 | 0.09 | 100 | | 56 | 56.00 | 44 | 44.00 | 0 | 0.00 | 4.82 |
| Baker | 1020 | 848 | 83.14 | 172 | 16.86 | 0 | 0.00 | 7 | | 4 | 57.14 | 3 | 42.86 | 0 | 0.00 | 0.69 |
| Barnes | 1188 | 14 | 1.18 | 1142 | 96.13 | 32 | 2.69 | 37 | | 1 | 2.70 | 36 | 97.30 | 0 | 0.00 | 3.11 |
| Browne | 1076 | 964 | 89.59 | 112 | 10.41 | 0 | 0.00 | 8 | | 8 | 100.00 | 0 | 0.00 | 0 | 0.00 | 0.74 |
| Coles | 634 | 17 | 2.68 | 414 | 65.30 | 203 | 32.02 | 18 | | 3 | 16.67 | 10 | 55.55 | 5 | 27.78 | 2.84 |
| Cullen | 1263 | 1206 | 95.49 | 57 | 4.51 | 0 | 0.00 | 2 | | 2 | 100.00 | 0 | 0.00 | 0 | 0.00 | 0.16 |
| Cunningham | 1327 | 14 | 1.01 | 1200 | 90.43 | 113 | 8.52 | 22 | | 0 | 0.00 | 20 | 90.90 | 2 | 9.09 | 1.66 |
| Driscoll | 1070 | 433 | 40.47 | 457 | 42.71 | 180 | 16.83 | 27 | | 14 | 51.85 | 12 | 44.44 | 1 | 3.71 | 2.52 |
| Hamlin | 1001 | 947 | 94.61 | 54 | 5.39 | 0 | 0.00 | 8 | | 6 | 75.00 | 2 | 25.00 | 0 | 0.00 | 0.79 |
| South Park | 931 | 451 | 48.44 | 478 | 51.34 | 0 | 0.21 | 28 | | 9 | 32.14 | 19 | 67.86 | 0 | 0.00 | 3.00 |
| Sundeen | 1007 | 875 | 86.89 | 123 | 12.22 | 9 | 0.89 | 2 | | 2 | 100.00 | 0 | 0.00 | 0 | 0.00 | 0.19 |
| Wynn Seale | 1190 | 134 | 11.26 | 1041 | 87.48 | 15 | 1.26 | 57 | | 6 | 10.53 | 51 | 89.47 | 0 | 0.00 | 4.79 |
| TOTALS | 20940 | 10988 | 52.47 | 9044 | 43.19 | 908 | 4.34 | 763 | | 308 | 40.37 | 419 | 54.91 | 36 | 4.72 | 3.64 |

68. Plaintiffs' Exhibit 18, a book by Dr. Thomas P. Carter entitled *Mexican Americans in School: A History of Educational Neglect*, (published in 1970 by College Entrance Examination Board, New York), consists of data concerning the kind and quality of formal education available to Mexican-Americans and the

Mexican-Americans get in duration of time.[69] Our nation is becoming polarized and fragmented, and this has the effect of radicalizing many of our young people. It is not enough today to pay lip service to the Constitution by tokenism.

While many of our institutions have a tendency to divide us—religious institutions, social institutions, economic institutions, political institutions—the public school institution, as I see it, is the one unique institution which has the capacity to unite this nation and to unite this diverse and pluralistic society that we have. We are not a homogeneous people; we are a heterogeneous people; we have many races, many religions, many colors in America. Here in the public school system as young Americans, they can study, play together and interact. They will get to know one another, to respect the others' differences and to tolerate each other even though of a different race or color, or religious, social or ethnic status.

But be that as it may, the Supreme Court has resolved that problem for the district court by saying that separate education and educational facilities are inherently unequal and therefore unconstitutional.

Therefore the court finds for the plaintiffs and the injunctive relief prayed for will be granted.

Because the courts, especially in the South, are finding that a bi-racial or human relations committee appointed by the court can aid the school boards and the courts through these trying times, and in these complex problems of creating a unitary system and maintaining them, this court is of the opinion that a human relations committee appointed by this court will be of great help. Therefore, the plaintiffs and defendants will immediately provide the court with a list of fifteen names each of patrons of the Corpus Christi Independent School District, which list shall include the name, address, and telephone number of each person, and each list shall include five Negroes, five Anglos, and five Mexican-Americans. The court will choose from this list two names from each of the five names submitted, which will provide the court with a committee of twelve persons—four of which will be Anglo, four will be Negro, and four will be Mexican-American. The court will charge this twelve member human relations committee with the responsibility of investigating, consulting and advising with the school board, periodically, with respect to all matters tending to promote and to maintain the operation of a unitary school system which will satisfy the law.

Because this opinion and partial final judgment involves a controlling question of law as to which there is substantial ground for differences of opinion—insofar as this court is of the opinion that Mexican-Americans are an identifiable ethnic class who have suffered de jure and de facto segregation, who are protected as a class under the Fourteenth Amendment and the laws of the United States, who are now being subjected to a dual school system in violation of the Fourteenth Amendment and the laws of the United States, and who the court has found should be, and are, protected, and who should be in a unitary school system—the court is of the opinion that the defendant may utilize the procedures of 28 U.S.C.A.

nature of local and regional social systems and how they affect the opportunities of the Mexican-American. The book, and its author, Dr. Carter, who testified at the trial, indicate that the substantial segregation and isolation of the Mexican-Americans in the schools throughout the Southwest is a cause of negativism towards school on the part of these Mexican-American children which discourages these children from succeeding in public school. See plaintiffs' Exhibit 18, pg. 65–130. The court was impressed with the testimony of Dr. Carter, who summarized the matters contained in his book, plaintiffs' Exhibit 18, and accepts the conclusions he made on this point in his book and during his oral testimony.

69. See footnote 67, *supra*.

Sec. 1292 to the end that such an interlocutory immediate appeal, if the defendants should desire to do so, would materially advance the ultimate determination of this case. But this opinion, and the judgment to be entered immediately, will not be stayed pending this interlocutory appeal, if one is made, because of the defendants' right to an emergency appeal under Rule 2 and Related Rules and Practices of the Court of Appeals for the Fifth Circuit, and further because the parties have already had the transcript made of all the testimony and because the voluminous evidentiary data, which has been introduced into evidence, has been catalogued in such a manner that time will not be a real problem.

The plaintiffs and defendants will submit to this court by July the 15th a final plan which will achieve a unitary school system which will be educationally, administratively, and economically reasonable. It shall include a majority-to-minority transfer rule as suggested in Singleton, et al. v. Jackson Municipal Separate School District, 426 F.2d 1364, decided on May the 5th, 1970, by the Court of Appeals for the Fifth Circuit.

The deputy courtroom clerk of the court, Miss Baker, shall select the twelve names which will comprise the human relations committee by arranging all six stacks of five names in an alphabetical manner and taking the top two names from each stack. This will provide a human relations committee of twelve persons—four of which will be Negro, four will be Anglo, and four will be Mexican. The clerk will communicate immediately with these twelve persons and inform them that the court wishes that they serve on this human relations committee, and if any should decline to serve, the clerk then will take the next name from the particular stack. The court has not seen nor looked at those names and does not know who they are except the court did ask the lawyers, and does ask the lawyers, to give us competent people, which I am sure they have done.

The court reporter will immediately transcribe these oral findings of fact and conclusions of law in this opinion and will file it with the clerk of the court and provide each party with a copy.

This court shall retain jurisdiction of this case until it is satisfied that the dual system has been disestablished and an unitary system is in existence for a sufficient length of time to indicate the dual system will not tend to be re-established.